ABBOTT G. M. DIESEL, INC., a
Delaware Corporation, Plaintiff
and Appellant,

v.

PIPER AIRCRAFT CORPORATION, a
Corporation, and Piper Corporate Aircraft Center-West, a corporation, aka
Corpac-West, Defendant and Respondent.

No. 15016.

Supreme Court of Utah.

April 14, 1978.

Parsons, Behle & Latimer, F. Alan Fletcher, Kent W. Winterholler, Salt Lake City, for plaintiff and appellant.

Christensen, Gardiner, Jensen & Evans, Ray R. Christensen, Salt Lake City, for Piper Aircraft.

Snow, Christensen, & Martineau, John H. Snow, Salt Lake City, for Corpac-West.

WILKINS, Justice:

All statutory references are to Utah Code Ann., 1953, as amended, unless otherwise stated.

On or about November 8, 1974, plaintiff, Abbott G. M. Diesel (hereinafter "Abbott"), and co-defendant, Piper Corporate Aircraft Center-West aka Corpac-West (hereinafter "Corpac"), entered into a purchase agreement wherein Abbott agreed to buy, and Corpac agreed to sell, a Piper PA–31–P aircraft manufactured by co-defendant, Piper Aircraft Corporation (hereinafter "Piper").

Abbott contends that (1) this aircraft suffered an inordinate number of equipment and structural failures and defects beginning immediately after its delivery in November of 1974 and continuing regularly until January 9, 1976, and (2) these failures make this aircraft unairworthy, unreliable, not of marketable quality and unfit for its intended use.

Abbott's counsel wrote several letters to Piper, copies of which were sent to Corpac, informing Piper that the aircraft's numerous malfunctions rendered it unsafe and unacceptable. Piper responded assuring Abbott that Piper would repair the aircraft at its expense in an attempt to make it airworthy. The aircraft was returned to Piper's plant at Lockhaven, Pennsylvania, and after Piper performed approximately thirty different repairs during a three week period, Piper informed Abbott that the aircraft was in "good as new" condition. On the return trip of the aircraft to Utah, Abbott contends that it continued to malfunction.

Abbott commenced action in the District Court for Salt Lake County on February 23, 1976, against co-defendants Corpac and Piper for damages claiming breach of contract, breach of warranty, and mutual mistake. (Abbott claims mutual mistake against Corpac only.) Abbott alleges it paid $308,-646.27 for the aircraft and seeks damages against Piper in the approximate sum of $192,000.00. The summons was served on both defendants and specifically on Piper at its place of business in Pennsylvania pursuant to Section 78-27-24 (Utah's Long-Arm Statute). Piper argues that it was not subject to the jurisdiction of the Utah courts under this statute and moved to quash the service of summons upon it and dismiss the action for lack of personal jurisdiction. The District Court granted this motion against Piper, and Abbott appeals.

In support of its motion to quash, Piper filed an affidavit of John Leeson, Treasurer of Piper, the substance of which states that: Piper is a Pennsylvania corporation engaged in the business of manufacturing airplanes; it has three manufacturing plants, one in Pennsylvania and two in Florida; it carries on no business in Utah and has no employees or agents here; Piper has no records, bank accounts, investments, property, regional office, or affiliated company in Utah; there are some independent dealers in Utah who sell Piper Aircraft but that Piper has no interest in, control over, or business arrangements with these dealers; there is an independent corporation known as Intermountain Piper Incorporated (hereinafter "Intermountain"), authorized under the laws of the state of Utah and having its principal place of business in Salt Lake City, Utah, which acts as a distributor of Piper aircraft and sells this aircraft to said dealers; Piper owns no interest in Intermountain and the items of aircraft sold by Piper to Intermountain are sold F.A.F. (fly away basis) at Piper's manufacturing plants.

Abbott, in resisting the motion to quash filed the affidavit of William Farley, President of Intermountain, the substance of which states that: Intermountain is a corporation authorized under the laws of Utah; it is an authorized distributor of Piper by written contract between these two corporations and allows Intermountain to establish an organization in behalf of Piper for sale of Piper aircraft and other products within Utah and elsewhere; Piper initiated a program known as Piper Flight Centers for the purpose of establishing flight training in and rental of Piper aircraft, that program being available to Piper dealers and other airport operators through Piper distributors, including Intermountain; Piper encourages its distributors, within their areas, to establish these centers, and that there were five such centers in Utah; a uniform type of sign called "Piper Flite Center" has been established by Piper for the centers; said signs are the property of Intermountain—in its area of responsibility—but become the property of Piper upon the termination of Intermountain's distributorship; Intermountain has distributed to these centers information provided by Piper; Piper has authorized the dealers to use the Piper Flight Center format, design, program, system, lesson plans, and emblems as encouragement for the residents of Utah to rent, lease, or purchase Piper aircraft products; Intermountain has handled for transmittal to Piper various warranty items for Piper from and through such dealers and has transmitted in behalf of Piper to said dealers various credits on warranty of Piper products; Piper employees from time to time inspect the dealers' facilities in Utah

for the purpose of approving them as Piper maintenance facilities or Piper Service Centers; Piper regularly distributes through the mail notices pertaining to its products to registered Piper aircraft owners within Utah.

Abbott also filed an affidavit of Robert Abbott, President of Abbott, the substance of which states that: Abbott for several years has received numerous solicitations by direct mailing in the form of sales literature and other communications from Piper's corporation offices at Lockhaven, Pennsylvania; Piper solicits business of Utahns, including Abbott, through advertisements placed in nationally circulated trade magazines; and Piper employs a regional sales representative and a regional service representative, both of whom reside outside of Utah, who regularly visit Utah at five to six week intervals to promote customer relations and confer with Piper's sales outlets with respect to sales and service matters.

The parties disagree in the affidavits about many of the enumerated facts and disagree about the inferences to be drawn therefrom. Abbott contends that either under a "doing business" or "minimum contact" test that Piper has subjected itself to the jurisdiction of Utah Courts while Piper contends otherwise. No findings of fact were made or filed. We therefore reverse and remand for the purpose of having a hearing conducted below where conflicts may be resolved and findings of fact made.

The Utah Legislature enacted the long-arm statute in 1969[1] and it states in Sec. 78–27–24 that any person submits to personal jurisdiction in Utah concerning any claim arising from the following acts:

(1) The transaction of any business within the state;[2]

(2) Contracting to supply services or goods in this state;

(3) The causing of any injury within this state whether tortious or by breach of warranty;

(4) The ownership, use, or possession of any real estate situated in this state;

(5) Contracting to insure any person, property, or risk located within this state at the time of contracting;

(6) With respect to actions of divorce and separate maintenance, the maintenance in this state of a matrimonial domicile at the time the claim arose or the commission in this state of the act giving rise to the claim.

Sec. 78–27–22 in a statement of legislative policy and intent declares that the long-arm statute "should be applied so as to assert jurisdiction over nonresident defendants to the fullest extent permitted by the due process clause of the Fourteenth Amendment to the United States Constitution".[3]

As noted by Professor Kristine Strachan in her recent able article,[4]

Prior to enactment of the long-arm statute there were three primary bases on which Utah assumed in personam jurisdiction over nonresident defendants. With respect to nonresident individuals, Utah assumed personal jurisdiction over defendants personally served with process while physically present in the state . . [Additionally] personal jurisdiction could be asserted over a nonresident defendant as to tort claims arising out of the use or operation of a motor vehicle on Utah highways. Utah also assumed personal jurisdiction over nonresident defendants found to be doing business within the state. [Citations omitted.]

While it is true that this Court has stated that "if there is any difference between what is stated as the 'doing business' and

---

1. Sec. 78–27–22 to 28.

2. Sec. 78–27–23(2) defines "transaction of business within this state" as "activities of a nonresident person, his agents, or representatives in this state which affect persons or businesses within the State of Utah".

3. See *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945); *McGee v. International Life Insurance Co.,* 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), and *Hanson v. Denckla,* 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958).

4. *In Personam Jurisdiction in Utah,* 1977 Utah L.Rev. 235–36.

'minimal contact' tests it is probably more in semantics than in substance," [5] we now conclude that from an examination of many individual cases concerning jurisdictional matters, including the present one, there can well be a significant and controlling difference in those two concepts.[6]

The major concern of the parties is whether the long-arm statute, ante, applies, and therefore the discussion in this opinion basically revolves around that issue.

■ Though federal due process does not require this state—or, of course, any state—to enlarge the scope of personal jurisdiction allowed by the minimum contacts standard,[7] initially announced in *International Shoe*, ante, still, because our Legislature in 1969 [8] declared in clear, specific, and mandatory terms that the scope of that personal jurisdiction should be enlarged "to the fullest extent permitted by the due process clause of the Fourteenth Amendment", this Court herein acknowledges that this state's jurisdictional standards should not be more restrictive than those allowed by federal due process limitations.

The minimum contacts test springs from a measurement of the quality and nature of the defendant's activities within the forum state. We return to and cite *International Shoe* [9] to vivify this point:

It is evident that the criteria by which we mark the boundary line between those activities which justify the subjection of a corporation to suit, and those which do not, cannot be simply mechanical or quantitative. The test is not merely, as

has sometimes been suggested, whether the activity, which the corporation has seen fit to procure through its agents in another state, is a little more or a little less. . . . Whether due process is satisfied must depend rather upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure. That clause does not contemplate that a state may make binding a judgment *in personam* against an individual or corporate defendant with which the state has no contacts, ties, or relations. . . .

But to the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state. The exercise of that privilege may give rise to obligations; and, so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue. [Emphasis in original. Citations omitted.]

*Hanson v. Denckla*,[10] in commenting on the requirement of minimum contacts, further stated:

. . . The application of that rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activ-

---

**5.** *Hill v. Zale Corp.*, 25 Utah 2d 357, 360, 482 P.2d 332, 334 (1971).

**6.** See *In Personam Jurisdiction in Utah*, supra, note 4, where the difference between these two tests is portrayed and documented; also note particularly the conclusion therein at page 264 where it is stated: "General personal jurisdiction is the concept reflected in a doing business statute, which requires substantial and continuous local activity; specific personal jurisdiction is the concept applicable to a long-arm statute, which requires only minimum local contacts." Also see at pages 253–54 of this article comments that "Where a defendant's forum-state activity is extensive, the forum may assert personal jurisdiction on either related or unrelated

claims (doing business concept). Where the defendant has only minimum contacts with the forum, personal jurisdiction may be asserted only *on claims arising out* of the defendant's forum-state activity" (long-arm or "transaction of business" concept). (Emphasis added—citations omitted.)

**7.** *Perkins v. Benquet Consol. Mining Co.*, 342 U.S. 437, 446, 72 S.Ct. 413, 96 L.Ed. 485 (1952).

**8.** Sec. 78–27–22.

**9.** 326 U.S. at 319, 66 S.Ct. at 159.

**10.** 357 U.S. at 253, 78 S.Ct. at 1240.

ities within the forum State, thus invoking the benefits and protections of its laws.

■ The plaintiff, Abbott, alleges the commission by Piper of three acts enumerated in Sec. 78–27–24, viz., transaction of business, contracting to supply services and goods, and breach of warranty—all within this state. The long-arm statute can be invoked only if there are allegations that one or more of the enumerated acts therein obtain. Also Abbott's complaint—in substance—alleges that its claims arose from these enumerated acts.

The District Court, after remand, should as heretofore directed, conduct a hearing to resolve the conflicts of facts stated in the affidavits filed by the parties. And that hearing should be governed by inquiries into and a measurement of (a) the nature and quality of Piper's acts (b) whether Piper engaged in purposeful—rather than unintentional—acts in order to avail itself of the privileges and protections here (and the substance—not just form—of Piper's business relationship and acts should be ascertained), and (c) any other relevant mat-

ters bearing on " 'notions of fair play and substantial justice' ".[11]

The comments made herein are made advisedly, notwithstanding any previous adjudications of this Court which may seem to be to the contrary, and are made in order to infuse full vitality into the mandate by our Legislature to apply the long-arm statute to the fullest extent permitted by the Fourteenth Amendment in order to provide "its citizens with an effective means of redress against nonresident persons, who through certain significant minimal contacts with this state, incur obligations to citizens entitled to the state's protection".[12]

Reversed for action below consistent with this opinion. Costs to Abbott.

ELLETT, C. J., and MAUGHAN, CROCKETT and HALL, JJ., concur.

---

**11.** *International Shoe,* note 3, 326 U.S. at 317, 66 S.Ct. at 158.

**12.** Sec. 78–27–22.