SYNERGETICS, a Utah Limited Partnership, By and Through its general partner, LANCER INDUSTRIES, INC., a corporation, Addland Enterprises, Inc., Plaintiffs and Respondents,

v.

MARATHON RANCHING CO., LTD., Hans W. Roeck and John Does 1 through 10, Defendants and Appellants.

No. 19143.

Supreme Court of Utah.

June 19, 1985.

Joel R. Dangerfield, Ronald W. Goss, Salt Lake City, for defendants and appellants.

Ronald C. Barker, Robert L. Lord, Salt Lake City, for plaintiffs and respondents.

HALL, Chief Justice:

Defendants appeal a finding of jurisdiction of the Utah courts over them. They also appeal an order striking their answer and counterclaim and a default judgment entered against them "for failure to submit to discovery and to comply with lawful orders of the Court compelling discovery." We affirm.

Plaintiff Synergetics is a Utah limited partnership whose general partner, Lancer Industries, Inc., is an Illinois corporation. Plaintiff Addland Enterprises, Inc. is a California corporation. Defendant Marathon Ranching Co. (Marathon) is a Canadian corporation whose principal place of business is in Saskatoon, Saskatchewan. Defendant Hans Roeck (Roeck), Marathon's president, is a Canadian citizen whose residence is in California.

On May 23, 1980, negotiations which had been carried on in California and in Canada culminated in the execution of an agreement in Saskatoon, essentially exchanging certain Canadian property owned by Marathon for an ocean going sailboat owned by Addland.[1] Thereafter, any communication regarding the agreement was done by telephone, telegram or letter, with one exception. In March, 1981, Roeck came to Utah with his family. Roeck met with several agents of plaintiffs on social occasions (e.g. family dinners) during that time. Roeck also negotiated, drafted, and signed a revised agreement with Synergetics and Y.M.S. modifying the terms of the May 23, 1980, agreement. The modification substituted a different quarter section of land for that described in the original agreement. It also modified the rights and duties of the parties. The new caveat showing the revised legal description of the exchange land was drawn and recorded in Saskatoon and copies mailed to plaintiffs in Utah.

On March 9, 1983, plaintiffs filed a complaint against defendants in the third district court of Utah. Plaintiffs sought money damages and rescission of the agreement providing for the exchange of the sailboat for the Canadian property. Plaintiffs alleged that the transaction was the product of defendants' fraud, misrepresentations, and deceit.

Defendants responded to plaintiffs' complaint by appearing specially and moving to quash service of summons and to dismiss the complaint for lack of personal and subject matter jurisdiction. The motion was supported by an affidavit of Roeck and a memorandum of points and authorities. Both documents claimed that the entire transaction which was the subject matter of the lawsuit was negotiated and executed outside of Utah, and that defendants had insufficient minimum contacts with Utah for the Utah courts to exercise personal jurisdiction over defendants consistent with due process of law and Utah's Long Arm Statute. U.C.A., 1953, §§ 78–27–22 to –28.

Plaintiffs amended their complaint to allege the contacts upon which they based their claim that long arm jurisdiction could be exercised by Utah courts. These included: telephone calls from Roeck to agents of plaintiffs in Utah; letters from defendants into Utah; a telegram into Utah; and Roeck's March 1982 visit to Utah at which time the modified agreement was negotiated, drafted, and signed.

Defendants again moved to dismiss. The motion was denied by the district court without comment. Defendants then filed a petition for interlocutory appeal with the Utah Supreme Court. The district court stayed all proceedings pending Supreme Court action but ordered that, if defendants' petition was denied, defendants should file an answer to plaintiffs' amended complaint and produce Roeck for deposition in Salt Lake City within five business days thereafter.

---

1. In the agreement of May 23, 1980, Synergetics reconveys title to the boat to Addland, the original conveyer, who is listed as seller of the sailboat to Marathon. The titleholder of the land conveyed by Marathon is listed as Y.M.S., a Utah partnership. Robert D. Kent, secretary of Lancer Industries and general manager of Synergetics, signs as agent for both Y.M.S. and Synergetics.

On July 22, 1982, this Court denied the petition for interlocutory appeal. Defendants filed an answer to the amended complaint the same day, again raising the defense of lack of personal jurisdiction. Defendants also moved the district court for a protective order on the ground that all of the voluminous corporate books and records requested by plaintiffs were kept and maintained in Canada and that immediate production would be an unreasonable burden. Defendants further asked that Roeck be excused from the ordered deposition on the ground that Roeck was ill in Hawaii and under doctor's orders not to travel.

Plaintiffs responded by moving the district court to strike defendants' answer and award a default judgment. The district court denied plaintiffs' motion for sanctions, ordered production of documents, and ordered Roeck to appear in Salt Lake City for the taking of his deposition no later than August 27, 1982. Defendants produced a few of the documents. Defendants also moved for a later deposition date on the ground of Roeck's continued illness. The district court ordered Roeck to appear for his deposition no later than September 3, 1982, upon pain of sanctions. Roeck appeared for his deposition on September 3. Following a series of questions concerning his personal life, Roeck refused to answer any more questions and left the deposition.

On September 7, Roeck's attorney contacted plaintiffs' attorney to reschedule Roeck's deposition. Plaintiffs refused to reschedule and filed a motion with the district court to strike defendants' answer and enter a default judgment. On November 18, 1982, the court denied plaintiffs' motion but ordered Roeck to appear for his deposition before November 29, 1982. At the time of the order Roeck was out of the United States and out of contact with his attorneys and so did not receive notice of the order. When Roeck did not appear, plaintiffs renewed their motion to strike and for default judgment, which motion the district court granted on December 12.

Defendants objected to the default judgment on the grounds that Roeck had not received notice of the court's order requiring him to appear for deposition and that no hearing had been held on the issue of damages. The court then ordered a hearing held on defendant's objection to the judgment.[2] After the hearing on February 25, 1983, the judge ordered that "judgment may enter for damages upon the filing of appropriate affidavits concerning punitive and actual damages."

On March 14, plaintiffs filed an affidavit of Robert D. Kent, Jr. No counteraffidavit was filed by defendants. Based on Kent's affidavit, plaintiffs were awarded $352,000 in damages for conversion of the sailboat, $100,000 for rental of the boat, $200,000 in punitive damages, and costs. All contracts and agreements between plaintiffs and defendants were rescinded. Defendants did not thereafter object to the judgment.

Defendants appeal, seeking reversal of the judgment primarily on the basis that Utah courts lack personal jurisdiction over defendants.

Plaintiffs in this case do not claim that defendants were "doing business" in this State to such an extent that Utah courts would have general personal jurisdiction over defendants.[3] Plaintiffs do, however, contend that defendants had sufficient minimum contacts[4] with Utah related to this litigation that Utah courts were justified in asserting specific personal jurisdiction over defendants under section 78–27–24(1) of Utah's long arm statute. That section states:

> Any person ... whether or not a citizen or resident of this state, who in person or through an agent does any of the following enumerated acts, submits himself, and if an individual, his personal repre-

---

2. The transcript of this hearing, if any, is not in the record.

3. See *Abbott G.M. Diesel, Inc. v. Piper Aircraft,* Utah, 578 P.2d 850, 853 n. 6 (1978).

4. See *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

**1110**

sentative, to the jurisdiction of the courts of this state as to any claim arising from:

(1) The transaction of any business within this State; ....

"[T]ransaction of business within this state" is defined in section 78–27–23(2) as "[the] activities of a nonresident person, his agents, or representatives in this state which affect persons or businesses within the State of Utah."

In section 78–27–22 of the long arm statute, the legislature set forth its purpose in enacting the statute:

It is declared, as a matter of legislative determination, that the public interest demands the state provide its citizens with an effective means of redress against nonresident persons, who through certain significant minimal contacts with this state, incur obligations to citizens entitled to the state's protection. This legislative action is deemed necessary because of technological progress which has substantially increased the flow of commerce between several states resulting in increased interaction between persons of this state and persons of other states. The provisions of this act, to ensure maximum protection to citizens of this state, should be applied so as to assert jurisdiction over nonresident defendants to the fullest extent permitted by the due process clause of the Fourteenth Amendment to the United States Constitution.

Consistent with that policy declaration, this Court has held that the protection afforded by Utah courts must be extended to the fullest extent allowed by due process of law.[5]

Due process requires that before a court can exercise specific personal jurisdiction over a nonresident defendant, the defendant must have had "minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"[6] Defendants' "conduct and connection with the forum State [must be] such that [they] should reasonably anticipate being haled into court there."[7]

In order to determine whether the exercise of jurisdiction over a nonresident defendant would offend traditional notions of fair play and substantial justice, this Court has recognized that "the central concern of the inquiry into personal jurisdiction is the relationship of the defendant, the forum, and the litigation, to each other."[8] The assessment of that relationship involves determining whether the defendant has "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."[9] It must also be determined "[w]hether the cause of action arises out of or has a substantial connection with the activity; and ... [there must be a] balancing of the convenience of the parties and the interests of the State in assuming jurisdiction."[10]

The present action arose directly out of and is substantially connected to the modified contract which was negotiated, drafted, and signed by Roeck when he was in Utah. By transacting business in this state, Roeck satisfied the purposeful activity requirement of *Hanson* and *Mallory*. The same conduct establishes the requisite connection between the activity and the cause of action. Thus, the determination

**5.** *Brown v. Carnes Corp.,* Utah, 611 P.2d 378, 380 (1980).

**6.** *International Shoe, supra* note 4, 326 U.S. at 316, 66 S.Ct. at 158 (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 342, 85 L.Ed. 278 (1940)).

**7.** *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980).

**8.** *Mallory Engineering v. Ted R. Brown & Assoc.,* Utah, 618 P.2d 1004, 1007 (1980) (footnote omitted).

**9.** *Mallory* at 1008 (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958)).

**10.** *Mallory* at 1008. *See also American Land Program, Inc. v. Bonaventura Uitgevers Maatschappij,* 710 F.2d 1449, 1452 (10th Cir.1983).

of whether Utah can justify asserting jurisdiction over defendants hinges on the balancing of the fairness to the parties and the interests of the State in assuming jurisdiction.[11] There is no question that any litigation undertaken in a foreign forum results in some inconvenience to a nonresident defendant. However, in this case several factors mitigate this circumstance. First of all, Roeck intentionally traveled to Utah and allegedly committed fraud here to plaintiffs' detriment.[12] This type of conduct constitutes "conduct and connection with [Utah] ... such that he should reasonably anticipate being haled into court [here]."[13]

Secondly, while Roeck is a citizen of Canada and a resident of California, his business, including the presidency of Marathon, takes him all over the world. During the pendency of this litigation he resided in Hawaii for a period of time and was "out of the country" for an extended period. Thus, while Roeck has some ties to other states, none of those sister states appear to have any greater interests in this litigation than does Utah.

Next, the amount in controversy in this case is substantive compared to the costs of litigating the action. Therefore, the possibility of defendants defaulting on the basis that they cannot afford to litigate in this forum are minimal.[14]

Finally, the fact that Roeck apparently operates an interstate business enterprise involving land sales influences our determination that it is not inconvenient for Roeck to litigate away from his residence. As this Court said in *Mallory:*

> In undertaking interstate business [a defendant] must recognize and accommodate ... the probability and necessity of litigating in foreign forums. While the operation of an interstate business enterprise alone cannot justify personal juris-

diction over a non-resident defendant, the nature of [the enterprise] justifies placing upon it certain burdens connected with litigating in a foreign forum.[15]

Balanced against the inconvenience to the defendants is the express interest the state has in ensuring protection to its residents from the acts of nonresidents. The legislative mandate is clear: "the public interest demands the state provide its citizens with an effective means of redress against nonresident persons, who through certain significant minimal contacts with this state, incur obligations to citizens entitled to the state's protection." U.C.A., 1953, § 78–27–22.

Thus, balancing the interests of the State with the inconvenience to Roeck, the district court's extension of jurisdiction over Roeck was a reasonable and valid exercise of jurisdictional power.

Defendants rely on *Helicopteros Nacionales de Colombia, S.A. v. Hall,*[16] to support the contention that Utah's courts do not have personal jurisdiction over them. *Helicopteros* is inapposite here. Jurisdiction in *Helicopteros* was based on an assertion of general personal jurisdiction, not specific personal jurisdiction. All parties to the case conceded that the respondents' claims against Helicopteros did not arise out of Helicopteros' activities within Texas. The United States Supreme Court determined that the nature of Helicopteros' contacts with the State of Texas were not the kind of continuous and systematic general business contacts necessary to support general jurisdiction.

■ Defendants next argue that the entry of a default judgment against defendants pursuant to Utah R.Civ.P. 37(b)(2)(C), constituted a denial of due process since Roeck did not receive notice of the deposition date. This contention has no merit.

---

**11.** *See Mallory* at 1009; *Roskelley & Co. v. Lerco, Inc.,* Utah, 610 P.2d 1307, 1313 (1980).

**12.** *See Bonaventura, supra* note 10, at 1453.

**13.** *World-Wide Volkswagen, supra* note 7, 444 U.S. at 297, 100 S.Ct. at 567.

**14.** *See Mallory, supra* note 8, at 1009.

**15.** *Id.*

**16.** —— U.S. ——, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984).

The district court over a period of months scheduled multiple deposition dates to accommodate Roeck. Roeck was given ample opportunity to appear and be deposed. In the interests of judicial economy, the court finally set a deposition date and ordered Roeck to appear upon pain of sanctions. Roeck did not appear. In order to avoid sanctions, Roeck was given the opportunity at the February 25, 1983, hearing to show that his nonappearance was excusable. No such showing was made.

In light of the continuous ongoing proceedings and the numerous previous attempts by the plaintiffs to set a deposition date, Roeck was fully aware that he would have to subject himself to deposition proceedings. To attempt to avoid those proceedings by leaving the country and failing to communicate with his attorneys for months is inexcusable. Were this Court to allow such flagrant disregard for properly constituted orders of the lower courts, any defendant could avoid his obligations simply by becoming incommunicado. Such a result is simply unthinkable.[17] Roeck was given ample notice of the proceedings against him and ample notice that he had certain obligations under the law. That he did not receive notice of the final deposition date is attributable solely to his own actions. Roeck thus cannot now claim that he is denied due process of law.

■ Defendants finally argue that the district court erred in assessing damages against defendants without a hearing. This contention is without merit. On January 10, 1983, attorneys for the defendants objected to judgment against them since Roeck had not received notice of the deposition order and since no hearing had been held on the issue of damages. The district court on its own motion ordered a hearing on the defendants' objections. Following the hearing, the court ordered that judgment would enter for damages based "upon the filing of appropriate affidavits

concerning punitive and actual damages." Plaintiffs filed an affidavit setting forth in specific detail the agreement of the parties and the breach of the agreement; the numerous false representations made by the defendants of the value, marketability, and lack of encumbrances against the acreage to be exchanged for the boat; the damages sustained by loss of the boat as evidenced by the boat's fair market and rental value; and the propriety of a punitive damage award of $200,000. Defendants did not object to the affidavit, nor did they challenge the content thereof with opposing affidavits, although the court's order invited them to do so. The district court thus afforded defendants full opportunity to be heard on the issue of damages.

Defendants' remaining contention is that the district court erred in awarding punitive damages without proof.

In *First Security Bank of Utah v. J.B.J. Feedyards,*[18] the Court reiterated that in determining the amount of punitive damages, the factfinder should consider the following factors: the nature of the alleged misconduct, the extent of the effect of the misconduct on the lives of plaintiff and others, the probability of future recurrence of such misconduct, the relationship between the parties, the relative wealth of the defendant, the facts and circumstances surrounding the misconduct, and the amount of the actual damages awarded. Again, in *Behrens v. Raleigh Hills Hospital, Inc.,*[19] the Court observed that punitive damages are only appropriate in exceptional cases and are not meant to enhance the compensatory damage award. Rather, punitive damages must serve the interests of society by punishing and deterring outrageous and malicious conduct which is not likely to be deterred by other means. Punitive damages, among other things, punish conduct which manifests a knowing or

---

17. *See, e.g., W.W. & W.B. Gardner, Inc. v. Park West Village, Inc.,* Utah, 568 P.2d 734, 738 (1977) ("[t]he sanction of default judgment is justified where there has been a frustration of the judicial process . . .").

18. Utah, 653 P.2d 591, 598–99 (1982).

19. Utah, 675 P.2d 1179, 1186 (1983).

reckless indifference toward, and disregard of, the rights of others.[20]

 The peculiar facts and circumstances of the instant case meet the criteria as expressed in *J.B.J. Feedyards* and *Behrens* and support an award of punitive damages. After months of attempting to elicit deposition testimony from Roeck, the trial court determined to finally resolve the case. Defendants were given clear and ample notice of the bases on which the trial judge intended to award both actual and punitive damages: affidavits of the parties. Only plaintiffs submitted an affidavit. Defendants had the opportunity to contravene that affidavit and to present evidence to support the contention that the award was excessive, but chose not to do so. Therefore, the court had before it only the affidavit of the plaintiffs when it determined the amount of punitive damages. Thus, this Court must look at the award, keeping in mind the attempted frustration of the judicial process by defendants which resulted in the default judgment in the first place.

The affidavit submitted by the plaintiffs apprised the court of the relationship between the parties; the nature of the misconduct and the facts and circumstances surrounding it; the fact that the misconduct was engaged in knowingly and in disregard of plaintiffs' rights; the extent and effect of the misconduct on plaintiffs, and the amount of the actual damages sustained. The affidavit also afforded the court information necessary to reach a judgment as to the probability of future recurrence of such misconduct. The only possible deficiency in the evidence before the court was that of the relative wealth of the defendants. However, any such deficiency in the evidence was waived by defendants because they appeared at the hearing to set aside the default, had an opportunity to file counter-affidavits, were

on notice that the court intended to consider an award of punitive damages based upon affidavits, and, significantly, failed to object to plaintiffs' claim for punitive damages as set forth in the affidavit.

A punitive damages award must bear some reasonable relation to the actual damages.[21] In this case, actual damages were awarded in the amount of $452,000. Punitive damages were awarded in the amount of $200,000. Given the inverse ratio of actual damages to punitive damages, this Court cannot say that the damages were excessive.[22] Further, nothing supports an argument that the award resulted from passion or prejudice. Given the circumstances of the case, the award appears eminently reasonable. Therefore, the district court did not abuse its discretion in awarding punitive damages in the amount of $200,000.

The judgment is affirmed.

HOWE, DURHAM and ZIMMERMAN, JJ., concur.

STEWART, Justice (concurring and dissenting):

I concur in the majority opinion except for the award of $200,000 in punitive damages. In my view, that amount, on this record, is unconscionable. Furthermore, it is not justifiable under the standards set forth either in *Behrens v. Raleigh Hills Hospital, Inc.*, Utah, 675 P.2d 1179 (1983), or *First Security Bank of Utah v. J.B.J. Feedyards*, Utah, 653 P.2d 591 (1982).

---

**20.** *Id.*

**21.** *Bundy v. Century Equipment Co.*, Utah, 692 P.2d 754, 760 (1984).

**22.** *See, e.g., Bundy* at 759–60 (punitive damages were excessive where the award of punitive

damages exceeded the award of actual damages by 11.72 times).