**RESEARCH MEDICAL, INC., a Utah corporation, Plaintiffs,**

v.

**CANADIAN CARDIOVASCULAR PRODUCTS, LTD., a Canadian corporation, Defendants.**

**Civil No. 95–CV–795B.**

United States District Court, D. Utah, Central Division.

Feb. 8, 1996.

Gary R. Howe, John B. Lindsay, Callister Nebeker & McCullough, Salt Lake City, UT, for plaintiffs.

Todd M. Shaughnessy, Kenneth W. Yeates, Vancott Bagley Cornwall & McCarthy, P.C., Salt Lake City, UT, for defendants.

## MEMORANDUM OPINION AND ORDER

BENSON, District Judge.

This case came before the court on defendant's motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2), F.R.C.P. On January 29, 1996, the court heard oral argument on this motion. Plaintiff was represented by Gary R. Howe and Zachary T. Shields. Defendant was represented by Kenneth W. Yeates. Having fully considered the parties' written and oral arguments, as well as the accompanying affidavits, the court issues the following Memorandum Opinion and Order in accordance with the court's oral ruling at the hearing.

This motion requires a "minimum contacts" analysis under the Utah long arm statute and the federal due process clause. The jurisdictional facts in this case are straightforward.

## I. FACTUAL BACKGROUND

*The Parties.* Plaintiff, Research Medical, Inc., ("RMI") is a Utah-based corporation in the business of manufacturing and selling cardiovascular medical devices. Defendant, Canadian Cardiovascular Products, Ltd. ("CC"), is a Canadian corporation that markets medical products to hospitals and health care facilities in Canada.

*Defendant's business is centered in Canada.* Defendant's sales representatives and its health care customers are located solely in Canada. Defendant has no sales operations, business listings, bank accounts, real property, personnel, or customers in the United States. Defendant has never marketed any products in the United States.

*The Sales Agreement.* In October, 1993, the parties entered a Sales Agreement authorizing CC as the exclusive distributor of RMI's products in Canada, and precluding CC from marketing RMI's products in the United States. (Exhibit A to Clyde Baker Affidavit). The Sales Agreement listed RMI's business address in Midvale, Utah. The Sales Agreement contemplated a three-year renewable distributorship. (Sales Agreement, ¶ 8). All RMI products were and are manufactured and packaged in Utah. Under the agreement, CC agreed to purchase a substantial yearly quota of these products from RMI. (Id., ¶ 3 and attachment B.) All products sold to CC were to be delivered to CC "F.O.B. Midvale, Utah"— that is, CC took title to the goods in Utah and paid all shipping charges. (Id., attachment C.) Under the agreement, RMI was required to supply CC with catalogs, literature, price lists, training aids, and medical products. (Id., ¶ 2.) All customer returns of products by CC's customers required that written authorization be obtained by CC from RMI. (Id., attachment E.)

*Purchase orders, shipments, and payments.* Defendant purchased products from RMI on essentially a weekly basis from October, 1993, through March, 1995, and continued making a few purchases from RMI until August, 1995. Generally, CC would order

products from RMI by faxing purchase orders (prepared by CC) to RMI in Utah, which purchase orders listed RMI's Utah business address. (Exhibit 1 to Mark Winn Affidavit.) These purchase orders also included a fax cover sheet with hand written instructions by CC for RMI to ship the products via Federal Express. (Id., Exhibit 2.) RMI would then ship the requested products directly from Utah to CC in Canada with shipping costs paid by CC. Each shipment contained an RMI invoice directing that payment be sent to RMI in Utah for the products. Over 100 purchase orders were received by RMI in Utah from CC in the year between April, 1994, and March, 1995. CC paid RMI for the products by mailing checks to RMI in Utah. (Id., Exhibits 3, 5.)

*The litigation.* This lawsuit involves defendant's refusal to make payment on approximately 40 or more invoices representing orders shipped to and received by CC valued at over $150,000. (Id., Exhibits 6, 7.) The complaint alleges breach of contract, unjust enrichment, and tortious conversion.

*Pre-contractual discussions and negotiations.* The parties' business relationship began after their respective representatives met at a trade show in Chicago in April, 1993. Unhappy with its then existing distributor, RMI approached CC about becoming RMI's exclusive distributor in Canada. Subsequent negotiations and discussions occurred primarily at CC's offices in Canada. Defendant's first and primary contact person at RMI was Joni Halvarson, a regional manager in Minneapolis. CC's representatives made a few trips to RMI's regional offices in Minneapolis where RMI conducted sales training. CC representatives never visited Utah prior to entering the Sales Agreement, although there may have been one or two isolated instances of phone or mail contact with Utah. During this time, RMI's representatives made several trips to CC's offices in Canada. It appears that RMI drafted, approved and executed the Sales Agreement in Utah and mailed it to CC in Canada for CC's approval and acceptance.

*Other factors.* In October, 1993, Eileen Mesher, a product manager at CC, traveled to Utah for a tour of RMI's plant. In December, 1994, CC sent four employees to RMI headquarters in Utah for two days sales training and orientation. Defendant asserts that during the parties' course of dealing CC rarely contacted RMI's Utah office with questions; instead, CC would contact Ms. Halvarson in Minneapolis.

## II. PERSONAL JURISDICTION

■ *Specific Jurisdiction.* The court must consider whether defendant has sufficient contacts with the state of Utah such that the exercise of personal jurisdiction over defendant in this litigation satisfies both state law and the requirements of due process. The legal framework for the court's jurisdictional analysis is familiar. Under Utah law RMI must show (1) that CC has transacted business under Utah's long-arm statute; and (2) that a connection exists between CC's forum contacts and RMI's legal claims. U.C.A. § 78–27–24. Next, under the due process clause of the Fourteenth Amendment RMI must show (1) that there exist "minimum contacts" between CC and Utah; and (2) that personal jurisdiction over CC, based upon those minimum contacts, would not violate traditional notions of fair play and substantial justice. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472, 105 S.Ct. 2174, 2182, 85 L.Ed.2d 528 (1985); *Far West Capital, Inc. v. Towne,* 46 F.3d 1071, 1074 (10th Cir.1995).

### A. *Utah's Long Arm Statute*

#### 1. *Transacting Business*

U.C.A. § 78–27–23 defines the transaction of business within this state as "activities of a non-resident person, his agents, or representatives in this state which affect persons or businesses within the state of Utah." The Utah Supreme Court has given the phrase "transaction of business" a broad and expansive interpretation. *Synergetics v. Marathon Ranching Co.,* 701 P.2d 1106, 1109–10 (Utah 1985); *Mallory Engineering, Inc. v. Ted R. Brown Assoc., Inc.,* 618 P.2d 1004 (Utah 1980). CC essentially concedes, as it obviously must, that its business activities with RMI as RMI's Canadian distributor satisfy this requirement.

## 2. Connection to Plaintiff's Claims

██ CC contends, however, that even if it has "transacted business" in Utah, the mere "placement for orders for product and payment for such orders" does not meet the statute's requirement that RMI's claim "arise from" CC's transaction of business in Utah. CC's argument is mistaken. RMI correctly points out that this litigation arises *directly* from CC's contacts with Utah; namely, CC's placement in Utah of numerous orders for medical products, RMI's shipment of those products to CC, and CC's subsequent refusal to pay for a large portion of those products. However narrow or broad this statutory requirement may be, it is certainly met here.

### B. Due Process

#### 1. Minimum Contacts

██ It is settled that where a commercial actor's activities are "purposefully directed" toward residents of another state, the absence of physical contacts, alone, does not necessarily defeat personal jurisdiction. *Burger King*, 471 U.S. at 475–77, 105 S.Ct. at 2184. Rather, the Court has emphasized a "highly realistic" approach to determining whether the defendant has created a "substantial connection" to the forum state, recognizing that a contract is "ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." *Id.* at 479, 105 S.Ct. at 2185. The Supreme Court has cited four factors that are helpful in breach of contract cases in determining whether a defendant "purposefully established minimum contacts within the forum." *Id.* Three of the four weigh in favor of personal jurisdiction over CC in this case. For the reasons discussed below, the court concludes that CC purposefully established minimum contacts with Utah as part of a continuing contractual relationship with RMI.[1]

*Prior Negotiations.* RMI initiated discussions with CC at a trade show in Chicago about an exclusive distributorship in Canada. Negotiations prior to entering the Sales Agreement occurred primarily in Canada and Minneapolis. Prior to October 1, 1993, CC sent only one fax from Canada to Utah. RMI sent only one letter, the September 17, 1993 letter enclosing the proposed Sales Agreement, from Utah to Canada. The Sales Agreement was later executed by RMI and sent to Canada for CC's acceptance and execution. CC knew it was dealing with a Utah corporation, but the reality of the negotiations is that prior to entering the Sales Agreement, CC had virtually no significant contact with the state of Utah. This first factor weighs against personal jurisdiction over CC in this case.

While defendant's briefs focus extensively on it, this factor carries little weight in the court's overall analysis. This litigation is not about a dispute over the terms of the Sales Agreement; rather, this litigation is about CC's failure to make payment on 40 individual purchase transactions that occurred in the parties' course of dealing after the parties successfully had been operating under the Sales Agreement for over one year. Obviously, the purchase transactions were pursuant to the Sales Agreement, but each of the purchase transactions also constituted its own binding contractual obligation—which obligations were allegedly breached.

*Contemplated future consequences.* Although from CC's perspective the most significant aspect of the Sales Agreement was its contemplated ability to market products in Canada, CC also contemplated a continu-

---

1. Traditionally, tort claims may support personal jurisdiction based on significantly fewer forum contacts than contract claims so long as the forum contacts directly cause the tortious injury at issue in the litigation. *See, e.g., Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984); *Frontier Fed. Sav. Loan Ass'n v. National Hotel Corp.,* 675 F.Supp. 1293 (D.Utah 1987); *Berrett v. Life Ins., Co. of the Southwest,* 623 F.Supp. 946 (D.Utah 1985). Consequently, where tort claims are a focus, the jurisdictional analysis may vary slightly from the analysis in breach of contract cases. In the present case, although plaintiff's complaint includes a wrongful conversion claim, the nature and heart of this case, like *Burger King,* is overwhelmingly a breach of contract dispute. Plaintiff has not attempted to argue otherwise, and the parties' memoranda focus solely on a breach of contract analysis. Therefore, the court does not consider what additional impact, indeed if any, CC's alleged tortious conduct in this case might otherwise have on its motion and on the court's analysis.

ing relationship with a business it knew was located in Utah. That business contact in Utah was the life-blood of one of CC's product lines. CC contemplated placing orders and making payments in Utah, and with each order placed CC contemplated that RMI would respond by shipping the medical products on open account. Given the minimum requirements in the Sales Agreement, CC contemplated that the number of purchase transactions, as well as their dollar value, would be substantial. Any failure to pay for the medical products inevitably would have economic consequences on Utah residents. This second factor weighs in favor of jurisdiction, although it is not the driving factor in the court's analysis and conclusion.

*Terms of the contract.* RMI contends that the *terms* of the Sales Agreement and the purchase orders constitute significant contacts by CC with the state of Utah. The court agrees. CC eagerly entered an agreement that gave CC the economic advantage of an exclusive relationship with a Utah manufacture for the distribution of Utah products. CC entered a potentially long-term relationship with RMI, knowing that RMI operated out of Utah, requiring CC to purchase a substantial amount of products from RMI in Utah. CC also knew that customer returns of RMI products required written authorization from RMI in Utah. CC took title to the products in Midvale, Utah, paying the shipping costs to Canada. Thus, CC knowingly and gladly accepted the benefits and protections of Utah's laws and economy by entering the Sales Agreement. CC should not be surprised to find out that with those benefits came accompanying obligations in Utah.

The court notes that while the purchase orders sent to RMI by CC provide that the law of Ontario, Canada, governs any litigation arising from these purchase transactions, the relative significance of that consideration with respect to the subject of personal jurisdiction is extremely small.

Overall, the terms of the purchase orders and the Sales Agreement are contacts that weigh in favor of personal jurisdiction in this case.

*Actual course of dealing.* This is the driving and determinative factor in this case. With the advantages of its exclusive distributorship in place, CC purposefully directed its activities toward a Utah resident by placing numerous purchase orders with RMI in Utah for products that CC knew were manufactured in Utah. Defendant then made payments directly into Utah. These purchase transactions occurred almost on a weekly basis, and the total value of these orders was several hundred thousands of dollars. Thus, the parties' course of dealing involved hundreds of faxes and mailings—modern technology's version of minimum contacts.

These contacts within Utah were purposefully made as part of an ongoing obligation with Utah residents and were not due to any unilateral actions by RMI. As a result, CC is hard pressed to argue that its contacts were somehow random, attenuated, or fortuitous. CC willingly availed itself of the economic benefits and legal protections of the state of Utah. Importantly, the parties' actual course of dealing in Utah directly gives rise to this dispute. Overall, this fourth factor weighs decisively in favor of exercising personal jurisdiction.[2]

### 2. *Fair Play and Substantial Justice*

Once a court decides that a defendant has purposefully established "minimum contacts," it must determine whether the assertion of personal jurisdiction comports with fair play and substantial justice. Consequently, this court must evaluate and balance (i) the burden on CC of submitting to personal jurisdiction in Utah, (ii) Utah's interest in adjudicating this dispute, (iii) RMI's interest in obtaining convenient and effective relief, (iv) the judicial system's interest in efficiency and (v) any fundamental social policies implicated by this case. *Burger King,* 471 U.S. at 476–77, 105 S.Ct. at 2184.

---

**2.** The court notes that during the parties' course of dealing CC sent employees or agents to RMI's offices in Utah on two occasions. Although this factor certainly might be significant in other contexts, it is not an important consideration in this case; indeed, the presence or absence of these facts would not affect the court's due process analyses or conclusions.

Defendant's contentions of overall unfairness are unpersuasive. Although it may be true that litigation in a foreign state, and especially a foreign country, is always burdensome, it is not always *unfairly* burdensome when the defendant has purposefully availed itself of the benefits of the forum state's laws and economy, and in so doing has breached obligations to forum residents. That is especially true in this case where the CC's contacts with Utah have been so numerous, frequent and substantial, and where these contacts have directly given rise to the instant litigation. Contrary to CC's assertion, the state of Utah has a strong interest in adjudicating this dispute and ensuring a convenient and effective relief to a complaining Utah resident such as RMI.

It should be of little if any weight that plaintiff could just as fairly be subjected to jurisdiction in Canada or that Canada also has a strong, legitimate interest in adjudicating this case. Even if litigating in Canada would, by some measure, be "more fair" to the parties (which does not appear to be the case), that disparity is not sufficient to overcome the strong inference of reasonableness established by CC's purposeful contacts with a Utah company, and in any event would more properly be considered in a motion to change venue. CC cannot point to any factor indicating that personal jurisdiction would be unreasonable, much less that it violates notions of fair play and substantial justice. Injustice would occur here only if RMI were not permitted to bring this action in Utah.

## III. CONCLUSION

CC has purposefully directed its business activities at Utah and in so doing has established contacts within this state, including an exclusive distributorship with RMI and the placement of over 100 purchase orders. Defendant's core argument—that CC's only contacts with Utah were the mere faxing of purchase orders to RMI (for receipt of products in Canada) and the mailing of payments to an open account in Utah—fails to account for the nature, quality and frequency of those contacts in Utah. In some respects the facts and circumstances in this case present an even more convincing case for personal juris-

diction than did the facts in *Burger King*, given that the heart these parties' relationship—the manufacture, ordering and shipment of RMI's products, along with CC's payment for the products—occurred to a large degree in Utah and was repeated continuously for a year and a half.

Where CC's interstate activities included forum contacts that purposefully enabled CC to obtain economic benefits and protections from this state, it would be unfair to allow CC to escape having to account for the consequences of those activities, especially where Utah residents may have been financially injured. CC's contacts within Utah constituted fair notice that failure to pay for products ordered from RMI under the Sales Agreement would have a substantial economic impact on a Utah business and on Utah residents, and would invariably subject CC to litigation in this state. Thus, while each of defendant's contacts, in isolation, might not support personal jurisdiction, taken together the contacts are much more than "minimum" and easily satisfy the fairness concerns of due process. Defendant's motion to dismiss is denied.

IT IS SO ORDERED.