**STAR STONE QUARRIES INC., Plaintiff,**

v.

**Robert L. GARLAND, Jr. and Vengeance Creek Stone, Inc., Defendants.**

**No. 2:03 CV 847 JTG.**

United States District Court,
D. Utah,
Central Division.

Dec. 29, 2003.

Ronald S. George, Pocatello, ID, for Plaintiff.

Bryon J. Benevento, Snell & Wilmer LLP, Salt Lake City, UT, William B. Hollberg, George M. Weaver, Hollberg & Weaver, Atlanta, GA, for Defendants.

## ORDER AND MEMORANDUM DECISION TO TRANSFER THIS CASE TO THE NORTHERN DISTRICT OF GEORGIA

J. THOMAS GREENE, District Judge.

This matter comes before the Court on defendant's Motion to Dismiss Plaintiff's Complaint or Transfer Venue.

## PROCEDURAL HISTORY

Plaintiff filed its complaint alleging breach of contract on September 9, 2003, and sought a Preliminary Injunction pursuant to Fed.R.Civ.P. Rule 65. Defendants responded by filing a Motion to Dismiss or Transfer Venue.[1] The motions were set for hearing and argued on October 27, 2003. At that time, the parties entered into a stipulated Interim Order in regards to plaintiff's application for Preliminary Injunction in order to maintain the status quo, and to require payment into this Court of monies received from any further sales of rock from the quarries in dispute in this case. After that order was entered, the Court heard evidence on defendants' Motion to Dismiss or Transfer Venue. Thereafter, the Court established dates for post-hearing filings, which were submitted by both parties. The matter was then taken under advisement and submitted to the Court for decision.

## FACTUAL BACKGROUND

Plaintiff contacted defendant by letter, dated January 3, 2003, (Exhibit 1D) in an effort to facilitate marketing stone and rock from its quarries in Utah and other western states to consumers on the east coast, and to explore the sale of its product in home garden stores. As a result, defendant Garland agreed to travel to Utah in order to meet with Lon Thomas, President of Star Stone Quarries, Inc. Mr. Garland did come to Utah and met with Mr. Thomas and other representatives of plaintiff on February 18, 2003. At that time, the parties discussed the plaintiff's product lines, examined samples of rock from plaintiff's quarries, and discussed possible cooperative marketing of the plaintiff's products. Plaintiff expressed particular interest in the possible marketing and supply of its product in connection with a contract de-

fendant was negotiating with Mannards, a retail garden store. Thereafter, multiple telephone conversations ensued, and in March plaintiff sent samples of its rock product to defendant. In May, the parties discussed at length the possibility of a joint venture to supply product to be marketed at Lowe's retail stores. In addition, the parties discussed a possible purchase or lease by plaintiff of defendants' stone quarries in Georgia. After further meetings in early June in Salt Lake City, plaintiff's president Lon Thomas participated with defendant Garland at two joint presentations to Lowe's at its local and regional offices.

Defendant Garland returned to Salt Lake City on June 2, 2003 for further meetings. At those meetings, the parties discussed the possible purchase by plaintiff of one or two of defendants' quarries in Georgia. The parties also discussed defendants' financial needs and the possibility of a loan from plaintiff to defendant in order to buy out a former partner. There was further discussion of marketing and plaintiff supplied further samples of its product lines to defendants.

Lon Thomas testified that a firm oral arrangement was entered into at the June 2nd meeting for the purchase by plaintiff of defendants' Regal quarry in Georgia at an agreed upon price, the lease of defendants' Silver Creek quarry, as well as an exclusive supplier arrangement. This was disputed by defendant Garland at the evidentiary hearing on October 27, 2003.

After the meetings in Utah, plaintiff traveled to Georgia and started preparations to take over and run operations at defendants' Regal and Silver Creek quarries in Georgia in apparent implementation of the arrangements earlier negotiated by

---

1. Hereinafter, reference most often will be to individual defendant Garland who is the owner and president of defendant Vengeance Creek Stone, Inc.

the parties in Utah. Plaintiff hired a secretary, as well as numerous employees for the quarry operations, and set up contracts with companies in Georgia to lease equipment to mine the rock and to transport rock product to defendants' yard for shipment to customers.

The only written document concerning business arrangements between the parties was a so called "Blanket Purchase Order" entered into on June 28, 2003 (Exhibit P21). This purchase order was finalized and signed at the home of plaintiff's newly hired secretary in Georgia, and plaintiff began operations to remove the overburden from the underlying rock at the Regal quarry the day after the Blanket Purchase Order was signed. The circumstances surrounding negotiations for that document, as well as its purpose and intent, are in dispute.

The parties discussed but never formalized a more definitive agreement, apparently because they could not agree on at least two key matters, i.e. an exclusive right in favor of plaintiff to sell products derived from the quarries to defendants versus a right of first refusal by defendants, and the sale price of the Regal quarry. The parties continued negotiations through August and into September of 2003, but no final written contract was ever agreed upon.

Defendant Garland made a third visit to Utah on July 16, 2003 to discuss a price adjustment due to a lower price set by a competitor covering designer quartzite stone. As a result, plaintiff and defendants adjusted the prices downward from those set forth in the Blanket Purchase Order.

During the time that plaintiff conducted quarry mining operations in Georgia, quarried stone was delivered to defendants and defendants sent payments to plaintiff in Utah. Conflicting allegations by the parties were made at the aforesaid hearing on October 27th, including alleged missed payments and unfulfilled contracts involving third-party contracts for leased equipment, transportation of the stone, and improper packaging of the stone shipped by plaintiff to defendants.

Defendants locked plaintiff out of the quarry in Georgia which plaintiff was operating, and filed suit in state court in Georgia, after which the plaintiff filed the instant suit in the United States District Court for the District of Utah.

## PERSONAL JURISDICTION

■ Jurisdiction over a non-resident corporate defendant can be either general or specific. In this regard the Supreme Court of Utah has stated:

> General personal jurisdiction is the concept reflected in a doing business statute, which requires substantial and continuous local activity; specific personal jurisdiction is the concept applicable to a long-arm statute, which requires ... minimum local contacts.

*Abbott G.M. Diesel v. Piper Aircraft,* 578 P.2d 850, 853 n. 6 (Utah 1978).

Personal jurisdiction in this case is claimed on the basis of specific jurisdiction. Utah Code Ann. § 78–27–24 (1998) lists enumerated activities which may confer jurisdiction under Utah's long-arm statute. In this regard, the Utah Supreme Court has ruled that the statute should be read as broadly as is constitutionally possible, and should only be limited by the due process clause of the Fourteenth Amendment of the United States Constitution. *Synergetics v. Marathon Ranching Co.,* 701 P.2d 1106, 1110 (Utah 1985). *See also Nova Mud Corp. v. L.H. Fletcher,* 648 F.Supp. 1123, 1125 (D.Utah 1986). The activity set forth in the Utah statute which is relied upon to trigger the long-arm statute is the "transaction of business" provision defined as "activities of a non-resident

person, his agents, or representatives in this state which affect persons or businesses within the state of Utah." Utah Code Ann. § 78–27–23; *STV Int'l Marketing,* 750 F.Supp. at 1074–75.

This Court holds that the activities, telephone and internet contacts, meetings and negotiations by defendant in the District of Utah were sufficient to establish personal jurisdiction based upon provisions in the broad Utah long-arm statute.

FOURTEENTH AMENDMENT: DUE PROCESS

■ The Supreme Court has ruled that a defendant who reaches out beyond his native state and creates ongoing relationships and obligations with citizens of the forum state becomes subject to the forum state's jurisdiction. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 479–80, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *Travelers Health Assn. v. Commonwealth of Virginia ex rel. State Corp. Com'n,* 339 U.S. 643, 647, 70 S.Ct. 927, 94 L.Ed. 1154 (1950). Such ongoing relationships and obligations create the necessary minimum contacts so as not to offend traditional notions of fair play and substantial justice. *See generally Int'l Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Courts have emphasized "purposeful availment" as a primary basis upon which to overcome claimed violation of the Fourteenth Amendment. This Court has applied that doctrine where there exists "a purposeful act by which defendant avails himself of the privileges and protections of the forum." *Nova Mud Corp. v. L.H. Fletcher,* 648 F.Supp. 1123, 1125 (D.Utah 1986) *quoting Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958).

■ In the case at bar, it is undisputed that defendant Garland made several business trips to Utah to meet with plaintiff to discuss business opportunities. Evidence presented at the hearing established that defendant Garland came to Utah on February 18, 2003, on June 2, 2003 and again on July 13, 2003. The prime purposes of these meetings, particularly the June 2nd meeting, was to negotiate and enter into a business joint venture, to arrange for purchase by plaintiff of defendants' Regal Quarry located in Georgia, and to discuss a possible business loan of $167,000.00 by plaintiff to defendant Vengeance Creek. The parties dispute the facts regarding the exact offer and negotiations regarding sale of the Regal Quarry to plaintiff, and whether the terms and conditions a proposed Blanket Purchase Order were agreed upon during defendants' visit in June to Utah. Testimony at the hearing established that between each of the defendants' visits there were ongoing negotiations and communications between the defendants and plaintiff, as well as arrangements for payments to be sent to Utah from sales effected in Georgia. Some of such contemplated sales and money remittances in fact later did occur.

The parties do agree that a Blanket Purchase Order was signed in Georgia, and that plaintiff started work and production at the Regal rock quarry located in Georgia. This apparently implemented the arrangement which was discussed and negotiated in Utah, earlier in the month of June. Although the parties dispute the intent and meaning of said Blanket Purchase Order, and whether it reflected prices negotiated and arrived at in Utah, plaintiff did receive payments in Utah from defendants, drawn on defendants' Georgia bank account.

Based upon the forgoing, the Court finds that defendants' purposeful acts in Utah to enter into a business venture with the plaintiff fall within the ambit of the Utah long-arm statute. Further, such acts constitute a purposeful availment by defendants resulting in valid personal jurisdic-

tion which does not offend the traditional notions of fair play and substantial justice under the Fourteenth Amendment of the United States Constitution.

## VENUE

28 U.S.C. § 1404(a) provides:

For the convenience of the parties and witnesses, and in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

Congress enacted 28 U.S.C. § 1404(a) in 1948 "as a 'federal housekeeping measure,' allowing easy change of venue within a unified federal system." *Chrysler Credit Corp. v. Country Chrysler, Inc.*, 928 F.2d 1509, 1515 (10th Cir.1991). Under § 1404(a), both the transferor and the transferee court have venue over the action, but it is more efficient to prosecute the action in the latter court. *Id.*, 1515 n. 3. The *Chrysler Credit* court further stated: "Section 1404(a) is intended to place discretion in the district court to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.'" *Id.citing Stewart Org. v. Ricoh Corp.*, 487 U.S. 22, 29, 108 S.Ct. 2239, 2244, 101 L.Ed.2d 22 (1988) (additional citations omitted).

■ In determining whether it is proper to transfer venue, a court should consider a number of factors. *First,* the plaintiff's choice of forum. *Second,* the access of witnesses, including the availability of compulsory process to insure attendance of witnesses, as well as other sources of evidence. *Third,* the cost associated with presenting the required evidence in the case. *Fourth,* the enforceability of a judgment if one is obtained. *Fifth,* the relative advantages and obstacles to a fair trial. *Sixth,* any difficulties that may arise from congested dockets. *Seventh,* the possibility of the existence of issues arising in the area of conflict of laws. *Eighth,* the ad-

vantage of having a local court determine questions of local law. And, *ninth,* all other considerations of a practical nature that make a trial easy, expeditious and economical. *Chrysler Credit Corp.,* 928 F.2d at 1516; *see also Recovery Processes v. Hoechst Celanese Corp.,* 857 F.Supp. 863, 866 (D.Utah 1994).

■ In the case at bar, although plaintiff chose to file the action in the District of Utah, only two or three of the witnesses appear to be Utah residents while the majority of the witnesses are Georgia residents. This includes the employees hired by plaintiff; twenty-one employees who had been hired but were later terminated by plaintiff after he discontinued operations at the quarry; representatives of the equipment leasing company, the transportation company and Dan Cain who arranged for the transportation of quarried stone; representatives of the Georgia bank (BB & T) used by the parties; and representatives of the blasting company. A few remaining witnesses are North Carolina residents. If this Court retained jurisdiction and venue it would lack compulsory power to assure the attendance of most of these witnesses, the vast majority residing far beyond 100 miles of this Court.

The cost of making the necessary proof doubtless would be less in the Northern District of Georgia due to the location of almost all of the evidence and witnesses for trial. Any judgment rendered by this Court would need to be enforced in Georgia because the quarries and rock lie in the State of Georgia. Also, any injunctive order relative to the real property should emanate from the State of Georgia. There would be no advantage in having this Court decide the matter as compared with a federal court in Georgia, particularly considering necessary application of Georgia law at least as to the real property matters. On the other hand, any potential

obstacles covering compulsory attendance of witnesses, and other evidence outside the control of the parties, would be eliminated if the case were to be transferred to Georgia.

The question of congested dockets does not appear to be a factor in this case. The application of the governing law in this case for the most part appears to be Georgia law. Resolutions of issues would be better determined by a court in Georgia in accordance with local custom and usage as it applies to this case.

In short, considerations of all applicable factors bearing upon transfer—including trial ease, efficiency, expedition and economy—all favor transfer in this case to the Northern District of Georgia.

In regards to other matters and issues of law raised by the parties in their post hearing memoranda,

'when an action is transferred, it remains what it was; all further proceedings in it are merely referred to another tribunal, leaving untouched whatever has been already done.' *Magnetic Eng'g & Mfg. v. Dings Mfg.*, 178 F.2d 866, 868 (2d Cir.1950) (L.Hand, J.). Accordingly, traditional principles of law of the case counsel against the transferee court reevaluating the rulings of the transferor court, including its transfer order.

*Chrysler Credit Corp.*, 928 F.2d at 1516. It follows that all other matters raised by the parties in post-hearing memoranda, including defendants' newly raised Statute of Frauds and Doctrine of Abstention arguments, are best left for the transferee court to rule upon.

Based upon the forgoing, this Court finds that the convenience of witnesses, fairness to the parties, and the interests of justice require that this case be transferred to the Northern District of Georgia. Accordingly, it is hereby

ORDERED, that defendants' Motion to Dismiss Plaintiff's complaint for lack of jurisdiction is DENIED; it is

FURTHER ORDERED, that defendants' Motion to Transfer Venue to the Northern District of Georgia is GRANTED.