**ROCKWELL INTERNATIONAL CORP.**

v.

**COSTRUZIONI AERONAUTICHE GIOVANNI AGUSTA, S.p.A. and S.N.F.A.**

**Civ. A. No. 81–3984.**

United States District Court,
E.D. Pennsylvania.

Dec. 22, 1982.

David L. Steck, Rawle & Henderson, Philadelphia, Pa., Joseph K. Powers, Bigham, Englar, Jones & Houston, New York City, for plaintiff.

James J. Donohue, and Mark L. Parisi, White & Williams, Philadelphia, Pa., Elliott M. Kroll, Kroll, Killarney, Pomerantz & Cameron, New York City, for defendant S.N.F.A.

Richard L. Goerwitz, Jr., Swartz, Campbell & Detweiler, Philadelphia, Pa., for Rudolph V. Pino, Speiser & Krause, P.C., New York City, for defendant Agusta.

## MEMORANDUM

GILES, District Judge.

This products liability suit arises from a helicopter crash over the Ohio River on January 16, 1981. The owner of the helicopter, Rockwell International Corporation ("Rockwell"), sues both the manufacturer, Costrozioni Aeronautiche Giovanni Agusta, S.p.A. ("Agusta") and the maker of an allegedly defective component part, SNFA. Both defendants are foreign corporations. Agusta has voluntarily submitted to the jurisdiction of this court, but SNFA moves to dismiss for lack of personal jurisdiction. For the reasons outlined below, SNFA's motion to dismiss shall be denied.

## FACTS

SNFA, a French corporation with no apparent place of business in the United States, designs and manufactures ball bearing assemblies. These assemblies, along with accessories and replacement parts are sold by SNFA to its Italian subsidiary, Somecat, S.p.A. Somecat is SNFA's exclusive distributor in Italy, who, in turn, sells the ball bearings and replacement parts to Agusta which is also an Italian corporation.[1] Agusta incorporates custom made SNFA bearings into its A–109 helicopter. Agusta then sells the helicopters to its United States distributor, Atlantic Aviation Corporation in Wilmington, Delaware. The chain of distribution is completed when Atlantic sells to the ultimate consumer. Replace-

---

1. Agusta presently has an office within the Eastern District of Pennsylvania.

ment parts for the ball bearing assemblies go through the same chain of distribution.[2]

Rockwell, a Delaware corporation with its principal place of business in Pennsylvania,[3] purchased an A–109 helicopter from . . . .Atlantic in October of 1977. Almost a year later, Rockwell bought seven replacement tail rotor drive shaft bearings from Atlantic. These bearings were designed, tested and manufactured by SNFA and had gone through the chain of distribution previously outlined. They were installed in the helicopter on April 2, 1979. On January 16, 1981, the bearings and the rotor drive shaft failed while the helicopter was flying over the Ohio River. The pilot was unable to maintain directional control and the helicopter crashed. Rockwell sues defendants under theories of negligence and the breach of express and implied warranties.

The ball bearings manufactured by SNFA are custom designed for the Agusta A–109 helicopter. They cannot be used in any other helicopter model. Agusta buys all bearings for the A–109 from SNFA. During the design and testing of the ball bearings, SNFA worked closely with Agusta engineers and was aware that the A–109 helicopter was targeted for the executive corporate transport market in the United States and Europe. SNFA has advertised its bearings in the *World Aviation Directory,* a publication widely circulated throughout Europe, Canada and the United States. In addition, it has an exclusive agreement with Air Supply Company, a division of Garrett Corporation, located in California. This agreement allows Air Supply to promote and sell SNFA's precision bearings throughout the continental United States. SNFA has also sold turbine engine bearings directly to General Electric Corporation and Garrett Corporation. The engines into which these bearings are incorporated are marketed throughout the United States.

## DISCUSSION

In deciding SNFA's motion to dismiss for want of personal jurisdiction, I must accept as true all of plaintiff's well-plead allegations of fact, viewing all reasonable inferences in the light most favorable to the non-moving party. *See Hollinger v. Wanger Min. Equipment Co.,* 667 F.2d 402, 405 (3d Cir.1981). *See also Empire Abrasive Equipment Corp. v. H.H. Watson,* 567 F.2d 554, 557 (3d Cir.1977); *Van Naarden v. Grassi,* 488 F.Supp. 720, 722 (E.D.Pa.1980). Once a defendant properly challenges the court's personal jurisdiction, the plaintiff has the ultimate burden of proving that the non-resident defendant's activities with the forum state permit the exercise of jurisdiction. *See Strick Corp. v. A.J.F. Warehouse Distributors, Inc.,* 532 F.Supp. 951, 953 (E.D.Pa.1982); *Boysen v. Treadway Inn of Lake Harmony, Inc.,* 53 F.R.D. 96, 98 (E.D. Pa.1971), *aff'd per curiam,* 463 F.2d 247 (3d Cir.1972).

Rule 4(e) of the Federal Rules of Civil Procedure permits a federal district court to exercise personal jurisdiction over a non-resident to the extent allowed by the law of the state where the court sits. *Western Union Telegraph Co. v. T.S.I. Ltd.,* 545 F.Supp. 329, 332 (D.N.J.1982). Pennsylvania's long arm statute, Pa.Cons.Stat.Ann. tit. 42 § 5322 (Purdon 1981) permits the exercise of personal jurisdiction "to the fullest extent allowed under the Constitution of the United States and may be based on the most minimum contact" with Pennsylvania allowed under the Constitution. Pa. Cons.Stat. tit. 42 § 5322(b). Where the state long-arm statute is written so broadly, the Third Circuit has failed to first examine the precise statutory language, instead focusing directly upon the constitutional due process requirements. *Carty v. Beech Aircraft Corp.,* 679 F.2d 1051, 1058 (3d Cir. 1982); *DeJames v. Magnificance Carriers Inc.,* 654 F.2d 280, 284 (3d Cir.), *cert. denied,*

**2.** Through Somecat, SNFA has supplied Augusta with approximately 2,200 bearings for use as both original and replacement equipment in the A–109 helicopter.

**3.** Subject matter jurisdiction is based upon diversity of citizenship, 28 U.S.C. § 1332 (1976). Since Rockwell is suing for over a million dollars, the amount in controversy requirement is satisfied.

454 U.S. 1085, 102 S.Ct. 642, 70 L.Ed.2d 620 (1981) (interpreting New Jersey long arm rule); *Western Union,* 545 F.Supp. at 332. Therefore, I must determine whether SNFA has sufficient "minimum contacts" with Pennsylvania "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (quoting *Miliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 342, 85 L.Ed. 278 (1940)).

 Plaintiff's cause of action arises out of a specific forum-related act. The thrust of the inquiry is upon whether there are sufficient contacts with the forum state arising from *that* "transaction" so as to justify the assertion of personal jurisdiction over the defendant. *See Reliance Steel Products Co. v. Watson, Ess, Marshall & Enggas,* 675 F.2d 587, 588 (3d Cir.1982). In order to conclude that the exercise of jurisdiction is permissible, three criteria must be satisfied. *See Lacovara v. Merrill, Lynch, Pierce, Fenner and Smith, Inc., et al.,* 551 F.Supp. 601 at 603 (E.D.Pa.1982). First, the cause of action must arise from defendant's activity within the state. I find that this element is satisfied. Rockwell's cause of action is traced from the sale of the ball bearings by SNFA, through its chain of distribution, to the apparent malfunction that allegedly caused the helicopter to crash. The sale,[4] malfunction and injury all occurred within Pennsylvania.

 The second requirement is that the non-resident defendant purposely availed itself of the privilege of acting within the forum, thus invoking the benefits and protections of the forum's laws. *See Hanson v. Denkla,* 357 U.S. 235, 246, 78 S.Ct. 1228, 1235, 2 L.Ed.2d 1283 (1958). Specifically, a corporation must engage in activities within the forum such that it is reasonably foreseeable[5] that it could be "haled into court there." *World-Wide Volkswagen v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980). As the Court noted in *World-Wide Volkswagen,* when the sale of a product is not an isolated occurrence, but comes about through the effort of the manufacturer to enter a market in other geographic areas, it is reasonable to subject that entity to suit where the allegedly defective merchandise has caused injury. Where a defendant has injected its product into the "stream of commerce" with the desire and expectation that it would be purchased in the forum state, the reach of due process is not exceeded when that state asserts *in personam* jurisdiction. *See World-Wide Volkswagen,* 444 U.S. at 297–98, 100 S.Ct. at 567, citing *Gray v. American Radiator & Standard Sanitary Corp.,* 22 Ill.2d 432, 176 N.E.2d 761 (1961).

Defendant argues that it has not purposefully availed itself of the privileges of conducting business within Pennsylvania. It maintains that it has confined its sales to the European market and that it is solely Agusta, which has purposefully availed itself of the United States and Pennsylvania market. This contention misses the mark. While SNFA's involvement in the sale and distribution of the ball bearing may be once or twice removed from Agusta's final sale to Rockwell, SNFA's purposeful availment, critical in the minimum contacts analysis, actually took place at an earlier point. That occurred when SNFA decided to enter and exploit the international "executive corporate transport market," and toward that end, began to work closely with Agusta's engineers to develop the ball bearings for the A–109 with the knowledge that the

---

**4.** The bearings were shipped "FOB Pittsburgh" by Atlantic to Rockwell's facility in Pittsburgh. They were billed to Rockwell and paid for in Pittsburgh. For tax purposes, the sale was a Pennsylvania transaction.

**5.** As the Supreme Court emphasized in *World-Wide Volkswagen,* the kind of foreseeability that is crucial is not the mere likelihood that a product would come into the forum State. If

that were the type of foreseeability involved then "(e)very seller of chattels would in effect appoint the chattel his agent for service of process. His amenability to suit would travel with the chattel. 444 U.S. at 296, 100 S.Ct. at 566. Necessarily, the mobility of the product cannot be determinative in the foreseeability analysis.

A–109 was to be marketed throughout the continental United States. Moreover, because the ball bearings are custom-made, SNFA intended its products to be an inseparable part of the marketing plan of Agusta.

In *World-Wide Volkswagen,* the Supreme Court drew a distinction between a local or regionalized dealer and a manufacturer or major distributor. Except for a rare sale, the local dealer generally confines the market he serves to a limited area. However, the marketing territory and the sale of a product by a manufacturer or distributor is not intended to be so confined. The sale of its product to a distant state is not simply an isolated occurrence, but instead, arises from the corporation's affirmative efforts to serve, *directly or indirectly,* the largest possible market for its product. *See World-Wide Volkswagen,* 444 U.S. at 297–98, 100 S.Ct. at 567, citing *Gray v. American Radiator & Standard Sanitary Corp.,* 22 Ill.2d 432, 176 N.E.2d 761 (1961). *See also Tedford v. Grumman American Aviation Corp.,* 488 F.Supp. 144, 146 (N.D.Miss.1980) (overhauler of aircraft engines who remanufactured engine, delivered it into stream of commerce, with expectation that it would be purchased and used by someone engaging in agricultural pursuits).

The distinction between a dealer or distributor seeking to serve a limited market, and a manufacturer seeking to serve a larger market, was recognized by the Superior Court of Pennsylvania in *Goff v. Armbrecht Motor Truck Sales, Inc.,* 284 Pa.Super. 544, 426 A.2d 628 (1980). In quoting from *Developments—Jurisdiction,* 73 Harv.L.Rev. 909, 929 (1960), the court noted:

> It does not seem desirable to subject the California dealer who has sold tires to a Pennsylvania tourist to jurisdiction in Pennsylvania. However, it does seem that jurisdiction should be upheld over a California tire manufacturer who cannot be thought of as doing business within the state. While it is foreseeable by both defendants that their wares will be used in Pennsylvania, one is set up to do business locally whereas the other depends upon foreign consumption. Thus, it would seem unreasonable to force the local dealer to be prepared to defend suits on a nation-wide scale, while the national manufacturer which depends upon a national market can be so prepared.

284 Pa.Super. at 554–55, 426 A.2d at 633.

In *DeJames v. Magnificence Carriers, Inc.,* 654 F.2d 280 (3d Cir.) *cert. denied,* 454 U.S. 1085, 102 S.Ct. 642, 70 L.Ed.2d 620 (1981), the plaintiff, a New Jersey longshoreman, sued for personal injuries which he sustained while working on defendant's vessel while it was moored to a pier in the forum state. Defendant, Hitachi, a Japanese corporation, had converted the ship in Japan so that it would be capable of transporting automobiles. *DeJames* argued that the conversion work done by Hitachi had, in effect, made Hitachi the "manufacturer of the vessel," and therefore, amenable to jurisdiction under the stream of commerce doctrine. Focusing upon the indirect marketing scheme and the consequent economic benefits derived from residents of the forum, the Third Circuit explained:

> The stream-of-commerce theory developed as a means of sustaining jurisdiction in products liability cases in which the product had traveled through an extensive chain of distribution before reaching the ultimate consumer. Under this theory, a manufacturer may be held amenable to process in a forum in which its products are sold, even if the products were sold indirectly through importers or distributors with independent sales and marketing schemes. Courts have found the assumption of jurisdiction in these cases to be consistent with the due process requirements identified above: by increasing the distribution of its products through indirect sales within the forum, a manufacturer benefits legally from the protection provided by the laws of the forum state for its products, as well as economically from indirect sales to forum residents.

654 F.2d at 285.

It is more appropriate to characterize SNFA as a manufacturer, competing in an

international market rather than as a local French dealer. The *DeJames* court did not accept plaintiff's argument that Hitachi was a manufacturer, and consequently, it declined to apply the stream of commerce theory to that case. However, the distinctions which the *DeJames* court drew, firmly place SNFA within the line of stream of commerce situations. First, although Hitachi did not utilize the owners of the ship it "manufactured" as distributors of its product, SNFA and its subsidiary, clearly did so. They had to distribute the product through Agusta's distribution system; the bearing was uniquely designed for incorporation into Agusta's helicopter. Second, unlike Hitachi, SNFA took full advantage of an indirect marketing scheme. Finally, while Hitachi received no economic benefit, either directly or indirectly from the forum state, the same cannot be said of SNFA. By virtue of the sale of the bearing in question, defendant derived, at a minimum, an indirect pecuniary benefit from Pennsylvania.

In *Oswalt v. Scripto, Inc.,* 616 F.2d 191 (5th Cir.1980), the stream of commerce doctrine was applied to impose jurisdiction over a non-resident defendant like SNFA. A Japanese cigarette lighter manufacturer, Tokai-Seiki, and its exclusive American distributor, Scripto, were sued for injuries sustained when a Texas consumer was seriously burned by the lighter's alleged malfunctioning. The Japanese manufacturer, which produced, sold and delivered millions of the lighters to Scripto in Japan, was held reasonably to know or expect that the sales through its exclusive distributorship system would be nation-wide. The Fifth Circuit found these facts sufficient to impose *in personam* jurisdiction. The court held that the lighter manufacturer should have known that its products would reach Texas, and any or all other states, in the normal course of the distribution chain. Nothing in

the facts of *Oswalt* indicated to the court that Tokai-Seiki has attempted in any way to limit the states in which its lighters could be sold. Given the distribution arrangement, the manufacturer's conduct and connection with the forum were such that it could reasonably have anticipated being haled into court there. *Id.* 616 F.2d at 198–200. *See also Noel v. S.S. Kresge Co.,* 669 F.2d 1150, 1155 (6th Cir.1982); *Cooper Industries, Inc. v. J & J Fabrics, Inc.,* 212 U.S.P.Q. 433, 434 (1980). The case at bar is analogous. Given the distribution system, SNFA had ample reason to know and expect that its bearing, as a unique part of a larger product, would be marketed in *any* or *all* states, including the Commonwealth of Pennsylvania. Like the manufacturer in *Oswalt,* SNFA did not in any way attempt to restrict its market or limit the states in which its bearings could be sold.

SNFA argues that although it may have been foreseeable that its bearings would find their way into any given state, under *World-Wide Volkswagen,* foreseeability alone is insufficient to establish minimum contacts. 444 U.S. at 295, 100 S.Ct. at 566. While it is true that this kind of foreseeability is not determinative, it is noted that SNFA chose to participate in a nation-wide marketing chain. This makes the sale of products incorporating its bearings, not merely foreseeable, but affirmatively welcomed.[6] By virtue of having a component specifically designed for the Agusta helicopter, SNFA had a "stake in," and expected to derive definite benefit from sales of the Agusta A–109 (and replacement parts) in the United States. *See Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distributors Pty. Ltd.,* 647 F.2d 200, 203, 205 (D.C.Cir.1981). *Cf. Jacobs v. Lakewood Aircraft Service, Inc.,* 493 F.Supp. 46, 48 (E.D.Pa.1980). Thus, I find that the second

**6.** In no way is this observation based upon the "mobile" character of the helicopter. The argument that the inherent mobility of the automobile made it foreseeable that the product would turn up in any state, was precisely the impetus for *World-Wide Volkswagen's* qualification of the "foreseeability" factor of the minimum contacts test. Regardless of the type of

end-product into which SNFA's part was incorporated, the fact that SNFA chose to sell the custom-designed bearing to a company such as Agusta, which utilized a multi-national distribution system, makes the sale and incident in Pennsylvania more than fortuitous. *Compare DeJames v. Magnificance Carriers, Inc.,* 654 F.2d at 286.

requirement is satisfied because SNFA did "purposely avail itself" of the privilege of doing business in Pennsylvania.

 The final prong of the analysis focuses upon whether the exercise of jurisdiction was reasonable and fundamentally fair. SNFA designed and manufactured a component that was incorporated into a product which was intended to be, and was, in fact, sold in both Europe and the United States. Where that component allegedly fails and causes injury in the very market in which the product was expected to be sold, it is not unreasonable or unfair to require the defendant to be subject to suit in that forum.

■ Moreover, a manufacturer or major distributor should not be allowed to profit from the sale of its product in a state, while simultaneously insulating itself from liability by establishing an indirect and multi-faceted chain of distribution. *See Poyner v. Erma Werke GMBH,* 618 F.2d 1186, 1190 (6th Cir.) *cert. denied sub nom. Insurance Co. of North America v. Poyner,* 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980). Simply because a business operation is structured in such a way as to avoid direct activity in the Commonwealth of Pennsylvania would not prevent the state courts from imposing personal jurisdiction upon the non-resident defendant. *Crucible, Inc. v. Stora Kopparbergs Bergslags AB,* 403 F.Supp. 9, 12 (W.D.Pa.1975).

As the Third Circuit aptly stated in *De-James:*

> Underlying the assumption of jurisdiction in these cases is the belief that the fairness requirements of due process do not extend so far as to permit a manufacturer to insulate itself from the reach of the forum state's long-arm rule by using an intermediary or by professing ignorance of the ultimate destination of its products.

654 F.2d at 285. *See also Poyner,* 618 F.2d 1186, 1189, quoting *Volvo of America Corp. v. Wells,* 551 S.W.2d 826, 828 (Ky.App.1977); *Novinger v. E.I. duPont deNemours & Co., Inc.,* 89 F.R.D. 588, 594 (M.D.Pa.1981).

Accordingly, I find that this court may properly exercise *in personam* jurisdiction over defendant SNFA, and defendant's motion to dismiss is denied.