Bruce G. PARRY, Plaintiff and Appellant,

v.

ERNST HOME CENTER CORPORATION, a Washington corporation; Pay N' Save, a Washington corporation; Ernst Home Center Corp., doing business in Idaho; Pacific Marine Schwabacher, a foreign corporation; Okada Hardware Co., Ltd., a foreign corporation; Mansour, Inc., dba West Coast Mercantile Company, aka WECO; Hirota Tekko K.K., a foreign corporation, Defendants.

MANSOUR, INC., Ernst Home Center Corporation and Pay N' Save, Third–Party Plaintiffs and Appellants,

v.

OKADA HARDWARE COMPANY, LTD., and Hirota Tekko K.K., Third–Party Defendants and Appellees.

No. 860278.

Supreme Court of Utah.

Aug. 7, 1989.

Mary Ellen Sloan, Daniel G. Darger, Salt Lake City, for Bruce G. Parry.

Gary D. Stott, Robert G. Gilchrist, Salt Lake City, for Mansour, Inc.

Roger R. Fairbanks, Salt Lake City, for Ernst Home Center Corp. and Pay N' Save.

Gregory J. Sanders, Heinz J. Mahler, Salt Lake City, for Okada Hardware Co., Ltd.

H. James Clegg, Stephen J. Hill, Salt Lake City, for Hirota Tekko K.K.

Donald J. Purser, Salt Lake City, for Pacific Marine Schwabacher.

HOWE, Associate Chief Justice:

Plaintiff Bruce G. Parry and defendant and third-party plaintiff Mansour, Inc., appeal the district court's dismissal of their complaints against defendants and third-party defendants, Okada Hardware Company, Ltd., and Hirota Tekko K.K., both Japanese entities. The district court held that it lacked personal jurisdiction over the third-party defendants and that Hirota Tekko K.K. had not waived its jurisdictional defense.

In January 1980, plaintiff was injured in Utah while splitting logs with a WECO maul which had been manufactured by Hirota Tekko K.K., a Japanese manufacturer. Hirota had sold the maul to Okada Hardware in Japan for export to the United States. Okada exported it to Mansour, a California corporation, who then sold it to Pacific Marine Schwabacher, its regional distributor. Schwabacher distributed and sold the mauls to retailers throughout the west coast and mountain area, including defendants Ernst Home Center Corporation and Pay N' Save. The Ernst Home Center in Twin Falls, Idaho, sold this particular maul to Linda Thayne in December, 1979. She then gave the maul to her father in Utah. Plaintiff borrowed it from him and was injured while using it.

Procedurally, plaintiff Parry filed this action for personal injuries against defendants Ernst Home Center Corporation and Pay N' Save. In its amended complaints, plaintiff also named Mansour, Okada Hardware, and Hirota as defendants. Mansour, Ernst, and Pay N' Save filed third-party complaints against Okada Hardware and Hirota. Hirota and Okada Hardware each filed motions to dismiss all the claims against them on the ground that the trial court lacked personal jurisdiction over them. The trial court granted each motion to dismiss and entered a final order of dismissal. Mansour filed an appeal of that order which was later joined by plaintiff Parry.

The Japanese defendants had been informed by Mansour that the maul would be sold in the western United States. Mansour had submitted numerous orders to Okada over an extended period of time prior to plaintiff's injury. These orders included the purchase and importation of WECO products, including chopping mauls identical to the one used by plaintiff. During the transaction of business with Okada and Hirota, Mansour and its representatives traveled to Japan and Japanese representatives from Hirota and Okada traveled to the United States to discuss the sale and distribution of products such as the WECO maul. On these occasions, Mansour discussed the fact that these products would be distributed for retail sales throughout the western United States and possibly in any state in the United States. There was no evidence proffered that either Hirota or Okada directly sold or advertised any of their products in Utah. Nevertheless, Ernst and Pay N' Save sold the same brand and model of chopping maul in their retail outlets throughout Utah on an intermittent basis. The Japanese defendants successfully contended in the trial court that there were insufficient minimal contacts with the state of Utah to warrant the exercise of long-arm jurisdiction for the injury alleged

by plaintiff because they had not purposefully availed themselves of Utah's forum. Plaintiff and Mansour contended that the state of Utah had jurisdiction over the Japanese defendants under the stream of commerce theory.

Mansour served its third-party complaint against Hirota, pursuant to the Utah Long–Arm Statute, Utah Code Ann. §§ 78-27-23, 78-27-24 (1987), and the Hague Convention. Convention on Service Abroad of Judicial and Extrajudicial Documents, Nov. 15, 1965, Hague, 20 U.S.T. 361, T.I.A.S. No. 6638. Masakazu Hirota, President of Hirota, responded by sending a handwritten letter to Mansour's counsel which was addressed to the trial court, viz., the Second District Court of Davis County. The letter stated that Hirota did not have "any responsibility for this matter, civil No. 33206.-" On the date of receipt, Mansour's counsel forwarded the letter to the Davis County court. Subsequently, Hirota filed its motion to dismiss. Parry and Mansour contend that Hirota has waived any jurisdictional defense. They contend that the letter was a pro se "answer" which failed to raise the defense of lack of personal jurisdiction and thus waiver occurred. Hirota contends that the letter cannot be construed as an answer and, therefore, it did not waive its jurisdictional defense.

The following questions are at issue: (1) whether Hirota answered plaintiff's complaint in its pro se letter to Mansour's counsel which was addressed to the district court and thereby waived its jurisdictional defense; and (2) whether the state of Utah has personal jurisdiction over Hirota and Okada, Japanese defendants, under Utah's Long–Arm Statute and principles of due process.

I.

█ We conclude that Hirota did not waive its jurisdictional claim through its pro se response. Hirota did not ask for affirmative relief of the court, which, had it done so, would have submitted itself to the court's jurisdiction. *Ted R. Brown & Assocs. v. Carnes Corp.*, 547 P.2d 206, 207 (Utah 1976). Instead, it merely denied responsibility for the injury and identified the case by its number.

Further, this Court has held that there was not an answer or a general appearance where a defendant sent a letter to plaintiffs' counsel, with a copy addressed to the clerk of the court. *Fibreboard Paper Prods. Corp. v. Dietrich*, 25 Utah 2d 65, 67, 475 P.2d 1005, 1006 (Utah 1970). In the letter, the defendant denied owing the bill sued upon and stated if further proceedings were had, the defendant's attorney would handle the matter. He captioned his letter to be an answer.

Based on this authority and the facts of the instant case, Hirota did not waive its jurisdictional defense.

II.

The inquiry with regard to the personal jurisdiction issue is twofold: First, we must determine whether our long-arm statute provides for the exercise of jurisdiction over the Japanese defendants. Second, we must determine whether the assertion of jurisdiction meets the requirements of due process. 2 J. Moore, *Moore's Federal Practice* ¶ 4.41–1[4], at 4–335 (2d ed. 1988) (footnote omitted); *Shaffer v. Heitner*, 433 U.S. 186, 203, 97 S.Ct. 2569, 2579, 53 L.Ed.2d 683, 697 (1977); *Bradford v. Nagle*, 763 P.2d 791, 793 (Utah 1988).

Utah's Long–Arm Statute, Utah Code Ann. § 78–27–24(3) (1987), provides for personal jurisdiction over a defendant as follows:

Any person, notwithstanding § 16–10–102, whether or not a citizen or resident of this state, who in person or through an agent does any of the following enumerated acts, submits himself, and if an individual, his personal representative, to the jurisdiction of the courts of this state as to any claim arising from: ... (3) the causing of any injury within this state whether tortious or by breach of warranty....

In some cases, it is appropriate to assume the application and thus to avoid construction of the state's long-arm statute, the first step in the twofold inquiry. *Bradford v. Nagle*, 763 P.2d at 793; *Synergetics v. Marathon Ranching Co.*, 701 P.2d 1106, 1110 (Utah 1985) (long-arm jurisdiction extended to the fullest extent allowed by due process). We so assume here and go to the due process issue.

Due process requires that before a court can exercise specific personal jurisdiction over a nonresident defendant, the defendant must have had "minimum contacts with the forum state such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Synergetics,* 701 P.2d at 1110; *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95, 102 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 342, 85 L.Ed. 278, 283 (1940)). Further, the defendants' "conduct and connection with the forum state [must be] such that [they] should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490, 501 (1980). The Court will examine whether the defendant corporation has "purposefully availed" itself of the privilege of conducting activities within the forum state. *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283, 1298 (1958). This Court has recognized that "the central concern of the inquiry into personal jurisdiction is the relationship of the defendant, the forum, and the litigation to each other." *Synergetics,* 701 P.2d at 1110; *Mallory Engineering v. Ted R. Brown & Assocs.,* 618 P.2d 1004, 1007 (Utah 1980) (footnote omitted), *cert. denied,* 449 U.S. 1029, 101 S.Ct. 602, 66 L.Ed.2d 492 (1980). The courts must also examine " '[w]hether the cause of action arises out of or has a substantial connection with the activity; and ... [whether there was a] balancing of the convenience of the parties and the interests of the State in assuming jurisdiction.'" *Synergetics,* 701 P.2d at 1110 (quoting *Mallory Engineering v. Ted R. Brown & Assocs.,* 618 P.2d at 1008. The United States Supreme Court stated that additional factors for inquiry include

the burden on the defendant, the interests of the forum state, and the plaintiff's interest in obtaining relief. It must also weigh in its determination "the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies."

*Asahi Metal Industry Co. v. Superior Court,* 480 U.S. 102, 113, 107 S.Ct. 1026, 1034, 94 L.Ed.2d 92, 105 (1987) (quoting *World–Wide Volkswagen,* 444 U.S. at 292, 100 S.Ct. at 564, 62 L.Ed.2d at 498); *see also* Strachan, *In Personam Jurisdiction In Utah,* 1977 Utah L.Rev. 235, 241.

The law on personal jurisdiction less than clear, and we confront now the law as it applies in the international context. At present, the due process approach taken by most courts in this country overlooks important differences between assertions of jurisdiction in the interstate context and those in the international context. *See* Born, *Reflections on Judicial Jurisdiction in International Cases,* 17 Ga.J.Int'l & Comp.L. 1 (1987). The United States Supreme Court's most recent decision, *Asahi Metal Industry Co.,* makes note of the inconvenience placed upon international defendants when balanced against the forum state's interest in litigating the plaintiff's claims: "The unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." *Asahi,* 480 U.S. at 114, 107 S.Ct. at 1034, 94 L.Ed.2d at 105. Nevertheless, *Asahi* seems to add little clarity to the already murky waters. On the subject of contacts as a whole, the pertinent cases have produced a considerable variance in results.[1] Indeed, just where

---

**1.** *See* Annotation, *Construction and Application of State Statutes or Rules of Court Predicating In Personam Jurisdiction Over Nonresidents Or Foreign Corporations On The Commission Of A Tort Within The State,* 24 A.L.R.3d 532, 546 n. 11 (1969); Annotation, *Products Liability: In Personam Jurisdiction Over Nonresident Manufacturer or Seller Under "Long–Arm" Statutes,* 19 A.L.R.3d 13 (1968 & Supp.1987), and cases cited therein.

The litany of cases shows the various conclusions to the "minimum contacts" issue: *Max Daetwyler Corp. v. R. Meyer,* 762 F.2d 290 (3d Cir.1985) (no personal jurisdiction over West

German manufacturer of doctor blades whose products were sold and shipped by an independent American distributor who took title to products in West Germany and placed advertisements in trade publications; personal jurisdiction not founded on aggregated (national) contacts with United States); *Humble v. Toyota Motor Co.,* 727 F.2d 709 (8th Cir.1984) (no personal jurisdiction over Japanese manufacturer of car seats who simply sold product in Japan to Toyota); *Hutson v. Fehr Brothers,* 584 F.2d 833 (8th Cir.1978) (no personal jurisdiction over Italian corporation which repackaged and resold allegedly defective chain to British compa-

the line of limitation falls on the power of state courts to enter binding judgments against persons not served with process within their boundaries has been the subject of prolific controversy, particularly with regard to foreign corporations.

The Japanese defendants rely upon *Asahi*, which examines the "stream of commerce" theory in significant detail. "[F]or the first time, the Court explicitly faced the question of whether the assertion of specific jurisdiction over aliens was subject to a different test than a similar assertion of specific jurisdiction over nonresident American citizens." Maltz, *Unraveling The Conundrum Of The Law Of Personal Jurisdiction: A Comment On Asahi Metal Industry Co. v. Superior Court of California*, 1987 Duke L.J. 669, 670 (footnote omitted). In *Asahi*, the Court held that the California state court's exercise of personal jurisdiction over a Japanese company which made and sold tire valve assemblies for tires made in Taiwan and then sold in the United States was unreasonable and unfair so as to violate due process. The plaintiff had been injured in a motorcycle accident. He filed a product liability action in the Superior Court of California for Solano County against the Taiwanese company, among others, alleging that the accident was caused by a sudden loss of air and an explosion in the rear tire of the motorcycle and that the motorcycle tire, tube, and sealant were defective. The Taiwanese company filed a cross-complaint, seeking indemnification from Asahi Metal Industry Co., the Japanese company that manufactured the tire valve assembly. The motorcycle driver settled his claims, leaving only the Taiwanese company's indemnity action against Asahi.

The Supreme Court's opinion as to part IIB held that the state's exercise of personal jurisdiction over Asahi violated due process because (1) the burden on the Japanese company was severe, since Asahi would be required to traverse the distance between Japan and California and required to submit its indemnity dispute to a foreign judicial system; (2) the interests of the Taiwanese company and the forum were slight in California's assertion of jurisdiction over Asahi; and (3) the procedural and substantive policies of other nations whose interests are affected by the assertion of jurisdiction over an alien defendant were not outweighed by minimal interest on the part of the plaintiff and the forum state. *Asahi*, 480 U.S. at 113–16, 107 S.Ct. at 1033–35, 94 L.Ed.2d at 105–07.

In parts IIA and III, Justice O'Connor, Chief Justice Rehnquist, Justice Powell, and Justice Scalia opined that Asahi had *not* taken any action to *purposefully avail* itself of the California market. Even assuming that Asahi *was aware* that some of the assemblies it sold to Taiwan would be incorporated into tires sold in California, the facts did not establish minimum contacts consistent with due process. They stated:

> The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, *designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as a sales agent in the forum State.* But a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State.

*Asahi*, 480 U.S. at 112, 107 S.Ct. at 1033, 94 L.Ed.2d at 104 (emphasis added). The four Justices also concluded that the plaintiff had not demonstrated any action by Asahi to purposefully avail itself of the California market:

ny which later, through an American subsidiary, introduced chain into Arkansas); *Rockwell Int'l Corp. v. Costruzioni Aeronautiche Giovanni Agusta*, 553 F.Supp. 328 (E.D.Pa.1983) (personal jurisdiction over French manufacturer of helicopter part intended to be sold in Europe and United States through Italian distributor; part was custom-made for A–109 with knowledge of its use in continental United States); *Hicks v. Kawasaki Heavy Indus.*, 452 F.Supp. 130 (M.D. Pa.1978) (personal jurisdiction over Japanese manufacturer of motorcycles who sold to exclusive sales agent in United States and who had knowledge of products' purchase at fifty-five dealerships in Pennsylvania).

Asahi does not do business in California. It has no office, agents, employees, or property in California. It does not advertise or otherwise solicit business in California. It did not create, control, or employ the distribution system that brought its valves to California. There is no evidence that Asahi designed its product in anticipation of sales in California.

*Asahi,* 480 U.S. at 112–13, 107 S.Ct. at 1033, 94 L.Ed.2d at 105 (citation omitted).

Justice Brennan, joined by Justice White, Justice Marshall, and Justice Blackmun, agreed with the Court's conclusion in part IIB that exercising personal jurisdiction over Asahi offended "traditional notions of fair play and substantial justice," but disagreed with the plurality's interpretation in part IIA of the stream of commerce theory and with the resultant conclusion that Asahi had not purposefully availed itself of the California market. Stating that the stream of commerce theory did not call for "additional conduct" directed toward the forum before jurisdiction over the defendant was proper and constitutional, Justice Brennan wrote:

> The stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale. As long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise. Nor will the litigation present a burden for which there is no corresponding benefit. A defendant who has placed goods in the stream of commerce benefits economically from the retail sale of the final product in the forum State, and indirectly benefits from the State's laws that regulate and facilitate commercial activity.

*Asahi,* 480 U.S. at 117, 107 S.Ct. at 1035, 94 L.Ed.2d at 107 (Brennan, J., concurring in part and in the judgment). Concurring specially, these Justices ventured to say that benefits accrued whether or not the participant conducted business in the forum state or engaged in additional conduct toward that state. The Justices concluded that minimum contacts existed because Asahi was aware of the distribution in California and it knew that it would benefit economically from the sale in California of products

incorporating its components. *Asahi,* 480 U.S. at 121, 107 S.Ct. at 1037, 94 L.Ed.2d at 110 (Brennan, J., concurring in part and in the judgment). Nevertheless, the exercise of personal jurisdiction over Asahi would not comport with "fair play and substantial justice." *Asahi,* 480 U.S. at 116, 107 S.Ct. at 635, 94 L.Ed.2d at 107 (Brennan, J., concurring in part and in the judgment) (citation omitted).

Finally, Justice Stevens, with whom Justice White and Justice Blackmun joined, concurred in part and concurred in the judgment, stating that an examination of minimum contacts was not necessary to determine whether California's assertion of personal jurisdiction was constitutional. Next, Justice Stevens stated that even assuming that the minimum contacts test ought to be formulated, it was misapplied in part IIA to the facts of the case:

> The Court seems to assume that an unwavering line can be drawn between "mere awareness" that a component will find its way into the forum State and "purposeful availment" of the forum's market. *Ante,* at 1033. Over the course of its dealings with Cheng Shin [the Japanese company], Ashai has arguably engaged in a higher quantum of conduct than "[t]he placement of a product into the stream of commerce, without more...."

*Asahi,* 480 U.S. at 122, 107 S.Ct. at 1038, 94 L.Ed.2d at 111.

Noting that the issue of purposeful availment requires a constitutional determination that is affected by the volume, the value, and the hazardous character of the components, Justice Stevens concluded:

> In most circumstances I would be inclined to conclude that a regular course of dealing that results in deliveries of over 100,000 units annually over a period of several years would constitute "purposeful availment" even though the item delivered to the forum State was a standard product marketed throughout the world.

*Asahi,* 480 U.S. at 122, 107 S.Ct. at 1038, 94 L.Ed.2d at 111.

Although it is clear that the Court held in part IIB that exercising personal jurisdiction over Asahi would offend " 'traditional notions of fair play and substantial justice" ' (citing *International Shoe Co. v.*

*Washington,* 326 U.S. at 316, 66 S.Ct. at 158, quoting *Milliken v. Meyer,* 311 U.S. at 463, 61 S.Ct. at 342), the Court remains significantly divided as to the validity of the stream of commerce theory in part IIA, which has necessitated and necessitates here a consideration of the analyses set forth in both part IIA and part IIB.

*Asahi* has been considered in the federal circuit courts. In *Benitez–Allende v. Alcan Aluminio Do Brasil, S.A.,* 857 F.2d 26, 30–31 (1st Cir.1988), the court held that a Brazilian manufacturer of pressure cookers was subject to long-arm jurisdiction in Puerto Rico based on its sale of 300,000 cookers, 240,000 of which were actively sold in Puerto Rico. In fact, the defendant, Alcan/Brasil, took active steps to sell its cookers in Puerto Rico by hiring an "export advisor" in Brazil who traveled to Puerto Rico to meet a Florida resident "sales representative" of Alcan/Brasil. They planned a deliberate marketing effort from the solicitation of orders to the ultimate sales arrangements in Puerto Rico. The court thus held that "additional conduct" existed as well as these other factors: Puerto Rico had an interest in protecting its citizens from injuries caused by defective products; the distance between Brazil and Puerto Rico was not as great as the distance between Japan and California; the legal system was roughly similar; and Puerto Rico had as much interest as any other political forum in the controversy. *Benitez–Allende v. Alcan Aluminio Do Brasil, S.A.,* 857 F.2d at 30. Distinguishing *Asahi*'s special circumstances in part IIB for denying jurisdiction, the court held that jurisdiction was constitutionally permissible, indeed, under the Court's reasoning in *Asahi. Id.* at 30–31.

The Ninth Circuit Court of Appeals held that a Swiss clinic was properly subject to personal jurisdiction in California because the clinic had concocted a story about the entertainer-plaintiff's treatment as part of its continuing effort to solicit clients in California. In *Sinatra v. National Enquirer, Inc.,* 854 F.2d 1191, 1192 (9th Cir. 1988), the court held that the statements made by employees of a Swiss clinic, Clinic La Prairie, S.A., to a Florida corporation's reporter about a California resident, Frank Sinatra, that were the foundation for an article published in a nationally circulated magazine were sufficient minimum contacts to establish personal jurisdiction in California. *The National Enquirer* falsely stated that Sinatra was given youth regeneration treatments at the clinic. This misappropriation was part of the clinic's ongoing efforts to advertise and solicit business in California. *Id.* at 1202. In fact, the Swiss actions through its agent constituted minimum contacts on several grounds: (1) the misappropriation of the value of Sinatra's name through interviews conducted in Switzerland between clinic employees and *The National Enquirer*'s reporters in which the clinic supplied false information about Sinatra's treatment at the clinic; (2) the clinic's California advertising efforts to attract patients; and (3) the clinic's knowledge of Sinatra's residence in California. In addition, California was the situs of Sinatra's injury. *Id.* at 1195. Again applying the factors outlined in parts IIA and IIB of *Asahi,* the court held that the clinic had purposefully availed itself of California's forum by its "affirmative conduct." *Id.* at 1195. *Cf. FDIC v. British–American Ins. Co.* 828 F.2d 1439 (9th Cir.1987) (personal jurisdiction over defendant, a resident of the Bahama Islands, was improper although an agent of defendant, an employee of a foreign defendant's subsidiary, signed the contract and conducted banking transactions in California. The court applied seven relevant factors in determining the reasonableness of asserting jurisdiction over a nonresident defendant as developed in the Ninth Circuit and held personal jurisdiction was unreasonable).

See also the following federal district court cases decided since *Asahi: Warren v. Honda Motor Co.,* 669 F.Supp. 365, 370 (D.Utah 1987) (Honda Motors' purposeful acts of placing its all-terrain cycle ("ATC") into a worldwide market, including the United States and Utah, was attributed to its subsidiary corporation and designer, Honda R & D, which designed its cycle for a particular, related manufacturer and known distributors. It deliberately designed the product for a worldwide market, including Utah); *Wessinger v. Vetter Corp.,* 685 F.Supp. 769, 777 (D.Kan.1987) (personal jurisdiction was proper over Japanese corporations Honda and Honda R & D because an American subsidiary, American Honda, distributed their motorcycles in Kansas); *John Scott, Inc. v. Munford, Inc.,* 670 F.Supp. 344, 345–46 (S.D.Fla.1987)

(personal jurisdiction was proper over Philippine manufacturer in Florida due to the agency relationship between the Florida furniture seller and the manufacturer); *Hall v. Zambelli*, 669 F.Supp. 753, 757 (S.D.W.Va.1987) (personal jurisdiction was proper over Japanese manufacturer of fireworks who sold directly to a Pennsylvania corporation which used the product in West Virginia); *Dittman v. Code–A–Phone Corp.*, 666 F.Supp. 1269, 1273 (N.D.Ind. 1987) (personal jurisdiction was proper over Japanese manufacturer of cordless phone which injured Indiana plaintiff; in addition to the parent-subsidiary relationship, officers of Uniden of Japan (parent) spent considerable time in Indiana and Uniden of America (subsidiary) was headquartered in Indiana); *A.I.M. Int'l, Inc. v. Battenfeld Extrusions Systems, Inc.*, 116 F.R.D. 633, 640 (M.D.Ga.1987) (personal jurisdiction over German corporate defendant was proper where defendant contracted with Georgia residents to sell products in Georgia, met there to negotiate the contract, and breach of contract claim arose there); *Ag–Chem Equipment Co. v. Avco Corp.*, 666 F.Supp. 1010, 1016 (W.D.Mich.1987) (personal jurisdiction was proper over Italian manufacturer of industrial diesel engines where manufacturer and American representative knew that engines would be marketed by Michigan subdistributor and where manufacturer agreed to warrant its agreement to end-users). In all of these cases, the courts applied the *Asahi* analyses and noted that minimum contacts existed based on the "additional conduct" of the foreign defendants. In those cases where there was a parent-subsidiary relationship, the courts readily found personal jurisdiction to be proper.

■ Whether the trial court has personal jurisdiction over the Japanese defendants in the instant case is a close issue. *Asahi* can be partially distinguished. First, in the instant case, plaintiff seeks recovery for personal injury resulting from the use of a defective maul. In *Asahi*, the co-defendant brought an indemnity action only and the plaintiff had settled his claim. The interests of plaintiff in this product liability action are much greater, as are the interests of Utah, in remedying personal injuries. Plaintiff resides here; the injury occurred here. Second, in this case, the maul was manufactured entirely and distributed directly to California by the Japanese defendants. Unlike *Asahi*, in which the Japanese tire valve assemblies were "once-removed" to Taiwan, placed into a completed Taiwanese product, and shipped by the Taiwanese company, the manufacturer and distributor of the maul had direct contact with Mansour of California. Further, only a portion of the finished tires which allegedly caused injury had components manufactured by Asahi. Third, in this case, Mansour had submitted numerous orders to Okada Hardware for the maul over an extended period of time prior to plaintiff's injury although Ernst stated that it did not know the length of time the product had been available for retail sales by Ernst and Pay N' Save.

Nevertheless, Hirota and Okada had not taken active steps to sell its product in Utah or Idaho as in *Benitez–Allende*. They were informed of potential sales to the western United States, but they neither came to Utah nor sent sales representatives to Utah to facilitate the marketing and purchase of their product. Further, the record does not provide the number or percentage of mauls manufactured which were actually sold in Utah. Finally, unlike *Sinatra*, although plaintiff was injured and resides in Utah, an advertising effort in Utah had not occurred sufficient to link the Japanese defendants to this forum.

Of the following examples of "additional conduct" outlined in *Asahi*, Hirota and Okada had not engaged in even one. The record does not show special designing for Utah's market, advertising in Utah, establishing channels for providing regular advice to customers in Utah, or marketing the product through a distributor who has agreed to act as a sales agent in Utah. *Asahi*, 480 U.S. at 111–12, 107 S.Ct. at 1033, 94 L.Ed.2d at 104. Parry and Mansour contend that the WECO maul was "advertise[d]" in the forum state." Their reply brief stated at page 1 that of the eleven findings of fact, the "finding that the maul in question was never advertised or sold in the State of Utah ... was clearly in error." The only evidence about advertising in the record is Ernst's and Pay N' Save's answers to interrogatories in answer No. 9, which stated, "The product was available for sale at all Ernst Home Center locations in Utah."

The record does not reveal any further knowledge or intent by Hirota and Okada

to specifically sell the product in Utah or in any other given state. True, the Japanese defendants have not placed any restrictions upon the sale of their products in any particular section of the United States. But an intentional and knowing distribution of the product in the western United States is not necessarily sufficient to satisfy the "minimum contacts" requirement. Further, Hirota and Okada have their principal place of business in Japan; neither has an office in Utah. They have no sales representatives or other agents, no bank account, and no personal property in Utah. They do not own, lease, or rent real property in Utah. Hirota and Okada have not solicited, directly or indirectly, the sale of any of its products in Utah. They have not provided brochures or sent any sales representatives to Utah. They do not render services in Utah and do not give advice to anyone in Utah with regard to the WECO maul. Without a showing of "additional conduct," we are unable to find that the eventual sale of a product in Utah justifies personal jurisdiction.

Hirota and Okada placed an allegedly defective product into the stream of commerce which injured plaintiff. If we were to accept plaintiff's argument that "minimum contacts" exist, we would do exactly what the Tenth Circuit warned against in *Fidelity & Casualty Co. of N.Y. v. Philadelphia Resins Corp.*, 766 F.2d 440, 447 (10th Cir.1985):

> In this case, the only contact that [the defendant] has with Utah which is related to the cause of action is the fact that [the defendant's] product happened to fail and cause damage in the State. The *World-Wide Volkswagen* court made it clear that a seller of chattels does not, in effect, "appoint the chattel his agent for service of process." [The defendant's] knowledge of the mere possibility that its product might be taken into a region of the country in which Utah is located is not sufficient, in our view, to make a difference in this regard.

(Citations omitted.) Therefore, the mere possibility that a maul might be taken from Idaho into Utah would be insufficient to make Hirota and Okada subject to Utah's jurisdiction.

This conclusion coincides with our own cases. In *Synergetics v. Marathon Ranching Co.*, 701 P.2d 1106, 1110 (Utah 1985), this Court applied the following standard to determine whether the exercise of jurisdiction over a Canadian defendant would offend traditional notions of fair play and substantial justice: (1) whether the defendant has purposefully availed itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws; (2) whether the cause of action has substantial connection with the activity; and (3) whether the court can balance the convenience of the parties and the interest of the state in assuming jurisdiction.

In *Synergetics*, because the defendant had contact with Utah by telephone, telegrams, and letters and because he visited Utah at the time the modified contractual agreement was negotiated, drafted, and signed, the first and second prongs of the test were satisfied. This Court balanced the interests of the state with the inconvenience to the defendant and held that the district court's jurisdiction was reasonable and valid because the allegedly fraudulent modified contract came into existence in Utah, the defendant traveled extensively in his interstate business enterprise, and the amount in controversy was substantial compared to costs of litigation. *Id.* at 1111. The court also reasoned that in undertaking interstate business, a defendant must recognize the probability and necessity of litigation in foreign forums. *Id.* at 1111 (citing *Mallory Engineering v. Ted R. Brown & Assocs.*, 618 P.2d 1004, 1009 (Utah 1980) (footnote omitted), *cert. denied*, 449 U.S. 1029, 101 S.Ct. 602, 66 L.Ed.2d 492 (1980)).

With regard to whether the Japanese defendants purposefully availed themselves of the privilege of conducting activities within the forum state, we note that Hirota and Okada did not make Utah a planned place of distribution, although they may have known Utah to be a potential place of distribution. Nor is it claimed that Hirota and Okada were the exclusive suppliers of mauls to the western states. In particular, they did not take advantage of Utah's business climate or the protection of its laws. *Pellegrini v. Sachs and Sons*, 522 P.2d 704, 707 (Utah 1974).

We note that the WECO maul which was used in Utah by plaintiff injured plaintiff. Unlike the clear situation in *Synergetics*, where the defendant visited Utah personally and negotiated, drafted, and signed a contract in Utah, the Japanese defendants

here merely manufactured and distributed a product which ultimately caused injury in Utah. Thus, the injury alone cannot satisfy the second prong.

Finally, whether Utah can justify asserting jurisdiction based on the balancing of the fairness to the parties and the interests of the state, there is no doubt that a nonresident defendant faces substantial inconvenience in litigating in a foreign forum. *Synergetics*, 701 P.2d at 1111. In any event, however, the question of convenience is a two-sided one. *Pellegrini*, 522 P.2d at 707. We emphasize the Court's hesitancy and refusal to render immunity to these Japanese defendants on the basis of inconvenience alone. Forcing the Japanese defendants to litigate in Utah would not disadvantage their " 'interest[s] in obtaining convenient and effective relief' " to any greater degree than would requiring plaintiff to litigate in California or Japan. *Bradford v. Nagle*, 763 P.2d 791, 795 (Utah 1988) (citing *Brown v. Flowers Indus., Inc.*, 688 F.2d 328, 332 (5th Cir.1982), *cert. denied*, 460 U.S. 1023, 103 S.Ct. 1275, 75 L.Ed.2d 496 (1983) (quoting *World–Wide Volkswagen Corp.*, 444 U.S. at 292, 100 S.Ct. at 564, 62 L.Ed.2d at 497)). The interests of the state to "provide its citizens with an effective means of redress against nonresident persons" is indeed significant. *Synergetics*, 701 P.2d at 1111. However, the minimal contacts by the Japanese defendants are insignificant and insufficient to "incur obligations to citizens entitled to the state's protection." Utah Code Ann. § 78–27–22 (1987). The burden is on plaintiff to show that defendant engaged in some substantial activity which constitutes a purposeful minimum contact within this state. *Pellegrini*, 522 P.2d at 708. Plaintiffs have not so demonstrated here.

Affirmed.

HALL, C.J., and STEWART, DURHAM and ZIMMERMAN, JJ., concur.